# MAHON, TRUSTEE IN BANKRUPTCY, ET AL. *v.* STOWERS ET AL.

No. 73–1131.  Decided April 15, 1974

PER CURIAM.

This litigation arose out of the bankruptcy of Samuels & Co., a large meat packing concern with plants in various parts of Texas. Respondents had sold cattle to Samuels, for which they received checks in payment, but bankruptcy ensued before the checks had been paid by the drawee bank. With the consent of all parties the receiver and the trustee of the bankrupt estate continued to sell meat from the cattle that had been slaughtered and packaged by Samuels and held the proceeds of such sales subject to disposition by the referee. Respondents sought reclamation of the cattle which they had sold to Samuels, and asserted a concomitant right to the proceeds from sale of the packaged meat. C. I. T. Corporation, which held a perfected lien on the bankrupt's inventory and other property, and the trustee in bankruptcy opposed the respondents' claim.

The referee made findings of fact and conclusions of law which sustained the respondents' position. The District Court upheld the referee's findings of fact, but reversed the judgment on the grounds that under the applicable provisions of the Texas Business and Commercial Code the claims of the trustee and C. I. T. were

superior to that of respondents. The Court of Appeals for the Fifth Circuit, however, agreed with the referee and reversed the District Court judgment because it read the Packers and Stockyards Act, 42 Stat. 159, 7 U. S. C. § 181 *et seq.*, and certain regulations issued by the Secretary of Agriculture thereunder, as establishing the superiority of respondents' claim notwithstanding Texas law. We disagree with this reading of the applicable provisions of the Packers and Stockyards Act, and therefore grant certiorari and reverse the judgment of the Court of Appeals.

I

The uncontested facts in this case are contained in the findings of the bankruptcy referee. The referee found that respondents, for a period of some ten days before Samuels filed a Chapter XI petition under the Bankruptcy Act, had been selling live cattle to Samuels for slaughter on a "grade and yield" basis, and that this was a recognized custom and usage in the trade. Under this usage the contract price is left open at the time of delivery to the purchaser, who slaughters the livestock and allows the carcasses to chill for approximately 24 hours. At that time they are graded by the United States Department of Agriculture and the price is determined. The purchaser then gives the seller a check for the established amount. The referee further found that Samuels was subject to the regulations of the Packers and Stockyards Act, and that all of the livestock in question had been delivered to Samuels at its plant in Mount Pleasant, Texas, where it was slaughtered and then graded by the Department of Agriculture.

Until the livestock is actually graded and the yield determined, the sellers can identify their particular livestock, but once the carcasses are processed and the meat packaged, identification is no longer possible. When the

petition for bankruptcy was filed in this case, none of the respondents was able to identify his own particular livestock, but the referee found that at least some of the carcasses sold by respondents were on Samuels' premises at that time. The referee also determined that no proceeds from sale of packaged meat could be identified as realized from carcasses delivered by respondents.

Examining the competing claims, the referee found that at all times material to the action C. I. T. was the holder of a duly perfected security interest in all livestock, animal carcasses, packaged and unpackaged meat, packing materials, and other inventory owned by Samuels or in which Samuels may have had an interest. At the time the bankruptcy petition was filed Samuels was indebted to C. I. T. in an amount in excess of $1,800,000. C. I. T. had been advancing large sums weekly to Samuels, and the bankruptcy was precipitated on May 23, 1969, when C. I. T., deeming itself to be insecure, refused to make a weekly advance of approximately $184,000 which Samuels needed to continue its operations. The referee found that C. I. T. "knew or should have known" of the method by which Samuels bought livestock from respondents on a grade-and-yield basis. He further found that no respondent held a security agreement with Samuels, and that none had filed a financing statement reflecting the transactions with Samuels.

The referee reasoned from these facts that respondents and Samuels had intended to transact their sales business on a cash, rather than a credit, basis, and that title to the livestock "did not pass from plaintiff to bankrupt until payment was made to plaintiff." Therefore, he concluded, C. I. T.'s perfected lien could not attach to the livestock in Samuels' inventory until the checks issued in payment were subsequently honored. Any

other decision would, he said, make the cattle sellers "a species of involuntary creditor against their wishes and intent," although they had complied with normal selling arrangements under the Packers and Stockyards Act. He found it unnecessary for the respondents to identify proceeds from the sale of specific carcasses which they had delivered, and placed the duty on C. I. T. to show that the funds to which it laid claim had not been received from the sale of carcasses furnished by respondents.

The District Court accepted the referee's findings of fact but reversed on the law. Turning to the provisions of the Texas Business and Commercial Code, which are largely counterparts of the Uniform Commercial Code, the court found that the respondents by their delivery of the cattle had retained only a security interest in those animals and the proceeds therefrom.[1] It further found that the respondents had taken no action to perfect their security interest[2] nor attempted to utilize any right of reclamation they might have had under Texas law.[3] Delivery of the cattle to Samuels on this basis enabled it to transfer good title to a good-faith purchaser for value, a category of persons which included both C. I. T. and the trustee in bankruptcy.[4] The District Court also found that respondents were unable to "establish their right to possession by ownership . . . [by] identify[ing] positively the property sought to be reclaimed in either its original or substituted form."

---

[1] Tex. Bus. & Com. Code §§ 1.201 (37) and 2.401 (a) (1968).

[2] Id., § 9.312 (c) (1968).

[3] Id., § 2.702 (b) (1968). The Court further noted that, in any event, the rights of C. I. T. and the bankruptcy trustee would not have been affected by a demand for reclamation under the Code. See § 2.702 (c).

[4] Id., § 2.403 (a) (1968).

The District Court was in turn reversed by a divided Court of Appeals for the Fifth Circuit. Although that court conceded that C. I. T. would have a superior right to the sales proceeds were the transaction governed solely by the provisions of the Texas Business and Commercial Code, it found that the Packers and Stockyards Act, 7 U. S. C. § 181 *et seq.*, along with the regulations promulgated thereunder and the relevant usages of trade, made Samuels a trustee of the proceeds received from the sale of cattle delivered by respondents. The court stated:

> "The reasoning of these cases and the impact of the Packers and Stockyards Act convinces this court that more than an unperfected security interest subject to reclamation is reserved for the cattle seller. Not by contract but by statute and regulation a packer lacks full dominion over the carcasses until the seller has been paid. Where the packer defaults by the issuance of a bad check (and destroys the identity of the security by processing the carcasses into fungible meat products), the seller is the beneficiary of a trust imposed by remedial statute." [5]

The right of the cattle sellers to funds thus found to be specifically held in trust for their benefit was deemed superior to the general perfected lien of C. I. T. on Samuels' inventory.

## II

This Court has previously held that an ordinary debtor-creditor relationship requires more than the post-bankruptcy disappointment of the creditor to convert it into a trust relationship. See *McKee* v. *Paradise*, 299 U. S. 119 (1936). Examining a claim by employees that funds held for their general benefit by an employee asso-

---

[5] 483 F. 2d 557, 563.

ciation were funds held in trust, the Court in *McKee* stated:

> "The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust. At no time throughout the whole period was there a trust fund or *res*. No fund was segregated or set up by special deposit or in any manner. When the wages became due, there was no such fund but only the general assets of the employer and its obligation to pay a debt. . . . The fact that the failure to pay the association was an acute disappointment and was especially regrettable as the claimant was an association of employees, cannot avail to change the debtor into a trustee or enable the creditor to obtain a preference over other claims against a bankrupt estate." *Id.*, at 122–123.

The Court therefore held that the employees were entitled to share in the bankrupt's assets only in the position of a general unsecured creditor.

Similarly, we believe that the Court of Appeals, in concluding that in this case a trust relationship existed between Samuels and respondents, placed more weight on the Packers and Stockyards Act, and corresponding regulations and practices, than they will properly bear. For although the Act does regulate methods of payment and recordkeeping procedures for persons defined as "packers" by the Act, we must remember that the "chief evil" at which it was aimed was "the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys." *Stafford* v. *Wallace*, 258 U. S. 495, 514–515 (1922). We find no evidence in either the Act or the regulations that

packers are to hold cattle or carcasses in trust until the sellers actually convert into cash the checks given them as payment for each sale.

We note at the outset that Samuels is subject to the Packers and Stockyards Act solely as a "packer"[6] rather than as a "stockyard owner,"[7] "market agency,"[8] or "dealer."[9] This difference is important, for the Act regulates packers in a different manner than it does those in the other enumerated categories. Thus, for example, the bonding requirements of 7 U. S. C. § 204 are not applicable to packers, nor does the Act give a private cause of action against packers, as it does against stockyards, market agencies, and dealers. 7 U. S. C. § 209. An implicit fiduciary obligation which would override state commercial law and establish a special priority in bankruptcy, such as the Court of Appeals found to exist here, must therefore be extracted either from the specific sections relating to packers, or from the few general sections which are applicable to all categories of persons subject to the Act.

The specific provisions dealing with packers impose no such duty.[10] The only section which might possibly be relevant to this question, 7 U. S. C. § 192, deals generally with unlawful practices of packers, placing heavy emphasis on practices which might be considered to be in restraint of trade. Enforcement of this section is the responsibility of the Secretary of Agriculture, who is given authority to hold hearings and enter binding orders. But there is no indication that, lurking within this intention to control deceptive and monopolistic practices in the packing industry, lies a further intention

---

[6] See 7 U. S. C. § 191.

[7] See id., § 201 (a).

[8] See id., § 201 (c).

[9] See id., § 201 (d).

[10] Id., §§ 191–195.

to guarantee persons who sell cattle to such packers a special favored position in regard to the packers' assets. Nor do the general provisions show such an intent.[11] Those sections are primarily concerned with recordkeeping, allocation of responsibility between the Secretary of Agriculture and the Federal Trade Commission, and the authority of the Secretary of Agriculture to promulgate appropriate rules and regulations to carry out the provisions of the Act.

The Court of Appeals did not rest its decision upon the Act itself, however, but rather upon two regulations promulgated by the Secretary of Agriculture. The first regulation, 9 CFR § 201.43 (b),[12] requires that a packer "before the close of the next business day following the purchase of livestock and the determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent the full amount of the purchase price, unless otherwise expressly agreed between the parties before the purchase of the livestock." The second regulation, 9 CFR § 201.99,[13] requires a packer "purchas-

---

[11] *Id.*, §§ 221–229.

[12] Title 9 CFR § 201.43 (b) reads:

"(b) *Purchasers to pay promptly for livestock.* Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and the determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent the full amount of the purchase price, unless otherwise expressly agreed between the parties before the purchase of the livestock. Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction. The provisions of this section shall not be construed to permit any transaction prohibited by § 201.61 (a) relating to financing by market agencies selling on a commission basis."

[13] Title 9 CFR § 201.99 reads:

"(a) Each packer purchasing livestock on a carcass grade, carcass weight, or carcass grade and weight basis shall, prior to such pur-

ing livestock on a . . . carcass grade and weight basis"
to "maintain the identity of each seller's livestock and
the carcasses therefrom" and, after determination of the

chase, make known to the seller, or to his duly authorized agent,
the details of the purchase contract. Such details shall include,
when applicable, expected date and place of slaughter, carcass price,
condemnation terms, description of the carcass trim, grading to be
used, accounting, and any special conditions.

"(b) Each packer purchasing livestock on a carcass grade, carcass
weight, or carcass grade and weight basis, shall maintain the identity
of each seller's livestock and the carcasses therefrom and shall, after
determination of the amount of the purchase price, transmit or
deliver to the seller, or his duly authorized agent, a true written
account of such purchase showing the number, weight, and price of
the carcasses of each grade (identifying the grade) and of the
ungraded carcasses, an explanation of any condemnations, and any
other information affecting final accounting. Packers purchasing
livestock on such a basis shall maintain sufficient records to sub-
stantiate the settlement of each transaction.

"(c) When livestock are purchased by a packer on a carcass
weight or carcass grade and weight basis, purchase and settlement
therefore shall be on the basis of carcass price. This paragraph
does not apply to purchases of livestock by a packer on a guaranteed
yield basis.

"(d) Settlement and final payment for livestock purchased by a
packer on a carcass weight or carcass grade and weight basis shall
be on actual (hot) carcass weights. The hooks, rollers, and gam-
brels or other similar equipment used at a packing establishment in
connection with the weighing of carcasses of the same species of
livestock shall be uniform in weight. The tare weight shall include
only the weight of such equipment: Provided, however, That until
July 1, 1968, these packers who shroud carcasses before weighing
them may include in the tare weight the average weight of the
shrouds and pins.

"(e) Settlement and final payment for livestock purchased by a
packer on a USDA carcass grade shall be on an official (final—
not preliminary) grade. If settlement and final payment are based
upon any grades other than official USDA grades, such other grades
shall be set forth in detailed written specifications which shall be
made available to the seller or his duly authorized agent. For

purchase price, to deliver to the seller a "true written account of such purchase" incorporating the pertinent terms. The Court of Appeals reasoned that these regulations, read in conjunction, were intended to provide cattle sellers with special protection when forced to deal on a carcass grade-and-weight basis. The protection fashioned by the Court of Appeals was to make a packer, such as Samuels, a trustee for the proceeds of any sale derived from cattle delivered under these provisions. We believe that that conclusion was erroneous.

We think that a fair reading of 9 CFR § 201.99 reveals its overriding concern that cattle sellers, having delivered their livestock into the hands of a purchasing packer prior to actual determination of the purchase price, receive a fair and accurate accounting of the proceeds of their sale. A seller operating without the benefit of such provisions clearly would face substantial risk that his livestock might be mingled with other livestock of lesser value and thereby become indistinguishable from livestock delivered by other sellers, or that he might become subject to arbitrary weighing practices on the part of the packers. Regulation 201.99 insures that the packers both observe principles of fair dealing in determining the proceeds of the sale and also maintain sufficient records so that the sellers and the Secretary of Agriculture can exercise proper supervision. But there is no indication in this record that Samuels failed to comply with the provisions of Regulation 201.99. Respondents complained, not that Samuels commingled their livestock, or failed to provide fair pricing, but rather that bankruptcy intervened before checks in the concededly

purposes of settlement and final payment for livestock purchased on a grade or grade and weight basis, carcasses shall be final graded before the close of the second business day following the day the livestock are slaughtered."

proper amount cleared the bank on which they were drawn. And Regulation 201.99 simply does not address itself to this problem.

Regulation 201.43, though more to the point, likewise fails to support the imposition of a trust on Samuels. It requires packers, market agencies, and dealers purchasing livestock to make payment within one business day following the determination of the amount of the purchase price, but does not meet the question of whether a seller, failing to receive payment within that time, has a special claim against the defaulting payor. Respondents argue strongly that this regulation insures prompt payment, and that the failure to make prompt payment is a prohibited deceptive practice under the Act. While this contention may well be true, it does not necessarily support a conclusion that the regulation, designed to regulate payment procedures between a buyer and seller, was also intended to determine security rights between the sellers and third parties holding a valid claim on the packer's assets. Whatever might be the policy reasons for insuring that packers did not take unnecessary advantage of cattle sellers by holding funds for their own purposes, it is hard to see that those reasons would automatically require that such sellers stand on better footing than persons who have extended secured credit to a packer. And the regulation in no way suggests an intention to override established principles of state commercial law which might strike a different balance.

When the Secretary has desired to impose trust relationships by regulation, he has chosen language which clearly effectuates that purpose. Regulation 201.42, 9 CFR § 201.42, deals specifically with the subject of custodial accounts, and provides in subsection (a) that payments made to a market agency or licensee are to be considered trust funds until a payee custodial account has

been paid in full. Subsection (b) requires that any market agency or licensee engaged in selling livestock "on a commission or agency basis" establish a custodial account for the sales proceeds. Subsection (e) requires establishment of custodial accounts when market agencies or licensees representing buyers of livestock misuse funds entrusted to them for that purpose.

Had the Secretary deemed it lawful and desirable to require that packers or other persons purchasing livestock establish trust accounts on behalf of the sellers until payment was actually received, such a provision could easily have been included within these regulations. Its absence suggests the Secretary expected that cattle sellers, making sales to packers in the ordinary course of business, would assume the normal risks of insolvency which any seller in that situation assumes. Their interests, like that of similarly situated sellers, would depend for protection upon their taking of appropriate steps under the commercial law of the various States in which they did business.

The cases cited by the Court of Appeals to support its position require no different conclusion. The case most heavily relied on, *Bowman v. Department of Agriculture*, 363 F. 2d 81 (CA5 1966), cited for the proposition that a packer's obligation to pay is that of a fiduciary, dealt not with packers at all, but rather with a person who was a stockyard owner, market agency, and dealer. The court in that case did discuss the duty of prompt payment by such a person, but the discussion occurred in the context of a discussion of the test for insolvency. The court there concluded that a definition of insolvency dealing with the relation of current assets and current liabilities was appropriate in this instance, since the ability to meet current obligations and to make prompt payment was necessary to effect the beneficial purposes

of the Act. The only specific discussion of trustee relationships, however, occurs in a separate discussion on the matter of custodial bank accounts. As discussed above, this discussion would be relevant to the obligation of market agencies under Regulation 201.42 to maintain custodial accounts and to refrain from commingling their own funds with the funds of the persons for whom they act. The other cases cited by the Court of Appeals do not deal with packers,[14] or deal with them in a totally different situation from that presented here.[15] None of the cases holds or even intimates that packers hold livestock and carcasses as trustees until cash proceeds are realized by the sellers.

## III

We hold that, on the undisputed facts of this case, nothing in the Packers and Stockyards Act or the regulations issued by the Secretary under the Act overrides the Texas Business and Commercial Code in determining the respective rights of the parties to the funds held by the trustee. We do note, however, that an isolated passage at the end of the Court of Appeals' opinion states that the "Packers and Stockyards Act and Regulations 201.42 and 201.99 thereunder comprise a course of dealing and usage of trade known to both the bankrupt packer and C. I. T., which had financed it for an extended period." 483 F. 2d 557, 563. While we hold that the Act and regulations do not *ex proprio vigore* override the provisions of Texas law determining priorities to the funds in question, we do not mean to say that a course of con-

---

[14] *Glover Livestock Comm'n Co.* v. *Hardin*, 454 F. 2d 109 (CA8 1972).

[15] *Bruhn's Freezer Meats of Chicago* v. *Department of Agriculture*, 438 F. 2d 1332 (CA8 1971); *Swift & Co.* v. *United States*, 393 F. 2d 247 (CA7 1968).

duct mandated by the Act or regulations might not, just as any other course of conduct, be relevant or even dispositive under state law. The District Judge, herself a longtime Texas practitioner and then state court judge before taking the federal bench, determined otherwise here. To the extent that respondents in appealing to the Court of Appeals challenged that determination, it will of course be open for adjudication in the Court of Appeals on remand.

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*