HAYS LIVESTOCK COMMISSION COMPANY, INC., a Kansas corporation, Plaintiff-Appellee,

v.

MALY LIVESTOCK COMMISSION COMPANY, INC., a foreign corporation, Defendant-Appellant,

Universal Surety Company, a foreign corporation, et al., Defendants.

PLAINVILLE LIVESTOCK COMMISSION COMPANY, INC., a Kansas corporation, Plaintiff-Appellee,

v.

MALY LIVESTOCK COMMISSION COMPANY, INC., a foreign corporation, Defendant-Appellant,

Universal Surety Company, a foreign corporation, et al., Defendants.

RUSH COUNTY SALES COMPANY, a partnership composed of Henry Reifschneider, et al., Plaintiffs-Appellees,

v.

MALY LIVESTOCK COMMISSION COMPANY, INC., a foreign corporation, Defendant-Appellant,

Universal Surety Company, a foreign corporation, et al., Defendants.

Nos. 73–1236, 73–1237.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 12, 1973.

Decided June 13, 1974.

---

3. 13 Vand.L.Rev. 772, 783, and cases cited therein.

Malcolm D. Young, Omaha, Neb. (Kenneth A. Nickolai, Omaha, Neb., and

Terry L. Bullock, Topeka, Kan., with him on the brief), for defendant-appellant, Maly Livestock Comm. Co., Inc.

Wayne W. Wallace, Wichita, Kan. (Robert Martin, Wichita, Kan., of counsel, Martin, Pringle, Schell & Fair, Wichita, Kan., with him on the brief), for defendant-appellant, Universal Surety Co.

Thomas C. Boone, Hays, Kan., for plaintiffs-appellees, Hays Livestock Comm. Co. Inc. and Plainville Livestock Comm. Co., Inc.

Marvin E. Thompson of Thompson, Holland & Arthur, Russell, Kan., for plaintiff-appellee, Rush County Sales Co.

Before LEWIS, Chief Judge, and MURRAH and HOLLOWAY, Circuit Judges.

MURRAH, Circuit Judge.

These consolidated appeals are from separate judgments of the district court sustaining separate reparation orders by the Secretary of Agriculture under the Packers and Stockyards Act of 1921 (7 U.S.C. § 201, et seq.) against Wenzl, a registered and bonded livestock dealer, and Maly, a registered and bonded marketing agent. (See §§ 203, 204.) We affirm the judgments with modifications to be noted.

The Packers and Stockyards Act was designed to comprehensively regulate packers, stockyards, marketing agents and dealers. The "chief evil" sought to be prevented or corrected is monopolistic practices in the livestock industry. Mahon v. Stowers, 42 U.S. L.W. 3577, 416 U.S. 100, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974). See also Denver Stockyard v. Livestock Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771 (1958); Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922). As a means to that end, various sections of the Act proscribe unjust, unfair, unreasonable or discriminatory practices.[1]

---

1. Sections 206, 208, 211, 212 and 213 regulate stockyards and dealers. Section 206

prohibits unjust or discriminatory rates; § 208 prohibits unreasonable or discriminatory

These cases are predicated on § 208, which prohibits "every unjust, unreasonable, or discriminatory regulation or practice" in respect to the furnishing of stockyard services.[2] The reparation orders were issued pursuant to investigations and hearings conducted under § 210(a) of the Act on separate complaints by three registered Kansas sales barns.[3] Complainants alleged that Maly and Wenzl violated the Act by dishonoring four drafts in the context of an arrangement whereby Wenzl drew bank drafts on Maly for purchases of livestock at complainants' sales barns in Kansas for delivery to Maly, which sold the livestock on commission at its pens in Omaha, Nebraska.

Jurisdiction in the district court is based on § 210(f) of the Act, which is also the statutory grounds for awarding of attorneys' fees to appellees. The district court found that the conditions of bonds, required by § 204, had also been violated and ordered payments, to the extent of the bonds, by Wayne McCaslin and Universal Surety Company, bondsmen for Wenzl and Maly, respectively. Only Maly and Universal have appealed.[4]

## Basic Facts

The basic facts are common to all three cases. Wenzl purchased livestock from appellees by drawing drafts on Maly. Nieman, the vice-president of Maly, had openly authorized Wenzl to draw such drafts as long as Wenzl "had cattle in our pens to cover [the drafts] when the drafts were presented."[5]

Wenzl had been doing business with Maly for "several" years and had been drafting on Maly for at least one year before these complaints were filed with the Secretary of Agriculture. The complaints were precipitated when a total of four drafts drawn by Wenzl in three separate but contemporaneous transactions for the purchase of cattle in early November, 1967, at the three different sales barns were dishonored by Maly and in each case the proceeds from the sale of the livestock applied to Wenzl's account.

## Specific Facts

### Rush

Rush sold 55 cattle and one hog to Wenzl at its sales barn on November 3, 1967, and accepted in payment a draft drawn on Maly. Five cattle were not shipped and were sold by Rush without notifying Maly, although the proceeds of this sale were later credited by Rush to the amount it claims is owed by Maly on the dishonored draft. Maly received the cattle shipped on November 4 and sold them two days later, crediting Wenzl's account, which was then in arrears. The draft in question was dishonored by Maly when presented on November 9, although it was later determined that Wenzl had sufficient cattle in Maly's pens to cover it on that date. Wenzl had drawn and Maly paid several prior drafts payable to Rush, and Maly's vice-president, Nieman, had on at least one occasion traveled to the Rush sales barn with Wenzl and had been in his company

practices generally; § 211 provides for orders by the Secretary to remedy unjust or discriminatory practices; § 212 permits the Secretary to prescribe rates and practices to prevent discrimination between intra and interstate commerce; and § 213 authorizes the Secretary to issue cease and desist orders to prevent unfair, discriminatory or deceptive practices.

2. The district court also cited § 213 of the Act and an Administrative Regulation of the Department of Agriculture, 9 C.F.R. § 201.-43(b), as jurisdictional authority. However, § 213 requires issuance of a cease and desist order by the Secretary and is not applicable

here. The Administrative Regulation is also inapplicable and not relied upon on appeal.

3. Section 210(a) specifically authorizes the Secretary to entertain complaints by aggrieved persons for violations of §§ 205–207 or § 208 or of orders of the Secretary made under §§ 201–203, 205–217a.

4. The proceeds of Wenzl's bond in the sum of $18,000 have been paid into the district court and appropriated among the sales barns for payment of attorneys' fees.

5. There is no direct evidence of a common understanding among the sales barns of the authority given by Maly to Wenzl.

when a draft was drawn on Maly. Maly had also once forwarded $15,000 to a Rush account for the credit of Wenzl. Maly points out, however, that money was forwarded to Wenzl only because he had cattle in the pens to cover it; that there is no specific evidence Rush relied on any direct or indirect drafting authorization given by Maly; and that Rush improperly sold the five cattle covered by Maly's draft without notifying Maly.

### Hays

On November 1, 1967, Hays sold 188 cattle to Wenzl at one of its regular auctions, accepting two drafts drawn on Maly in payment. Maly received the cattle on November 2 and sold all of them by the end of the next day, applying the proceeds to Wenzl's account. Maly dishonored the drafts when they were presented on November 6, although it had honored a draft given to Hays by Wenzl a week before, on October 25, and had confirmed by telephone on October 26 that the October 25 draft would be paid. Likewise, one day after the November 1 sale an employee of Maly responded to a telephone call from Hays stating that Hays would be called back if that draft were not honored. No such return telephone call was made. Maly asserts that there is no evidence that there were sufficient cattle in the pens to Wenzl's account when the draft arrived; that there is no evidence Hays knew of Wenzl's extensive shipments of cattle to Maly from other barns or that Hays relied on any specific assurances by Maly; that the telephone call from Hays on October 26 related only to the October 25 draft, which was paid; and that the November 2 telephone call from Hays indicates that Hays was not relying on any prior assurances from Maly.

### Plainville

On November 4, 1967, Wenzl paid for 41 cattle and one hog purchased from Plainville at its sales barn by a draft drawn on Maly. The livestock was received by Maly on November 5, sold the next day, and the proceeds retained by Maly as a credit to Wenzl's account. The draft was dishonored upon presentment on November 9. The record reveals that Wenzl had been giving Plainville drafts drawn on Maly for approximately one year, none of which had been previously dishonored, and that Maly had informed Plainville in February, 1967, that drafts given by Wenzl would be honored if there were sufficient cattle in the pens when the drafts arrived. Maly asserts that there was no evidence that Plainville relied on any prior assurances that drafts would be honored, nor any evidence that there were sufficient cattle in the pens to Wenzl's account when the draft arrived.

After investigation and a full hearing which developed the foregoing facts, the Secretary concluded that Maly had a "working arrangement with Wenzl, to pay for the latter's livestock purchases, to be reimbursed from the proceeds of resale"; that this type of an arrangement was "not unusual" in the livestock industry; and that Maly's previous acts and representations established a species of agency by estoppel between Wenzl and Maly. The Secretary also held that it was an unjust and unreasonable practice for Maly to retain the proceeds from the resale of the livestock knowing that the shippers of the livestock had not been paid.[6]

Section 210(f) of the Act provides in material part that if the defendant does not comply with an order of the Secretary, the complainant may file in federal

---

6. The Secretary cited an Agriculture Decision, Stockton Livestock v. Kuhlman, 25 A. D. 504 (1966). There, Kuhlman purchased cattle in the name of K & R Livestock Commission Company, which received and sold the cattle but failed to pay the shippers the full amount due. The judicial officer held that ". . . the liability of K & R in this particular transaction may be established even absent evidence of agency. . . . . K & R was not a bona fide purchaser, knowing that the cattle had not been paid for."

district court an enforcement petition and "[s]uch suit in the district court shall proceed in all respects like other civil suits for damages except that the findings and orders of the Secretary shall be prima facie evidence of the facts therein stated . . . ." In these suits to enforce the Secretary's orders the trial court took the cases on a stipulated record. And giving due prima facie weight and effect to the Secretary's orders, agreed with the Secretary, reasoning that:

> One who represents that he will honor drafts given by another for the purchase of cattle, and establishes a practice of doing so, thereafter, if the promisor receives such cattle, or has cattle in his pens to cover such drafts, is liable to the person to whom such drafts are given, and may not, after receiving such cattle, dishonor the drafts given pursuant to such representations and practice, and apply the proceeds from the sale of such cattle to a previous indebtedness which he has permitted the drawer of the drafts to create.

And further:

> Where a market agency has advised auction sales that it will honor drafts of a dealer for the purchase of cattle shipped to the market agency by the dealer, and over a long period of time the market agency honors such drafts, the auction sale to which a draft was given by such dealer for cattle shipped to the market agency is entitled to rely upon the previous advice of the market agency and the course of dealings thus established, and the market agency is estopped to deny its liability on the draft.

 The relevant case law is both controversial and helpful. In Capitol Packing Company v. United States, 350 F.2d 67 (10th Cir. 1965), a case in which we directly reviewed § 213(a) cease and desist orders, we noted the absence of any statutory definition of the critical phrase "unfair, unjustly discriminatory or deceptive practice"; that its

meaning "must be determined by the facts of each case within the purposes of the Packers and Stockyards Act," (at 76); and that "the responsibility for efficient regulation of market agencies and packers lies with the Secretary of Agriculture . . . . The proper scope of judicial review is limited to the correction of errors of law and to examination of the sufficiency of the evidence supporting the factual conclusions." (at 72). See also Glover Livestock Commission Company v. Hardin, 454 F.2d 109 (8th Cir. 1972); Bowman v. United States Department of Agriculture, 363 F.2d 81 (5th Cir. 1966); § 10(e) Administrative Procedure Act, 5 U.S.C. § 1009(e). This is, of course, the prevailing rule in administrative law. See Davis, Administrative Law Treatise § 29.01. It is consistent with the admonition that "[w]hen faced with a problem of statutory construction" courts are bound to give "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). See Trafficante v. Metropolitan Life Ins., 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); and cf. Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1965). Upon careful analysis of the findings and facts in the Capitol case, we sustained those findings supported by the evidence and rejected others which were not supported. We rejected the notion that one can be penalized for "almost" violating the Act and held that " . . . specified methods of dealing which are not themselves violations of the Act cannot, when added together, become a violation." (at 76–77).

 Federal courts have been at pains to point out that the Packers and Stockyards Act did not make of the Secretary a collecting agency. More specifically, the Act was not designed to provide a remedy for every worthless check or dishonored draft. Adams v. Greeson, 300 F.2d 555 (10th Cir. 1962); Guenth-

er v. Morehead, 272 F.Supp. 721 (S.D. Iowa 1967); Lewis v. Goldsborough, 234 F.Supp. 524 (E.D.Ark., W.D.1964); McClure v. E. A. Blackshere Company, 231 F.Supp. 678 (D.Md.1964). In Adams, a case involving recovery of damages for the conversion of livestock, possession of which was obtained by payment with a worthless check, federal jurisdiction was predicated and sustained under 28 U.S.C. § 1352 on a bond made pursuant to an Administrative Regulation authorized by § 204 of the Packers and Stockyards Act. State law was invoked, clearly governing the rights of the parties, and we held that "[t]he act does not have the effect of altering in part or superseding in whole the respective rights of the immediate parties under state law to a transaction of that kind." (at 557–558). The most recent and final authority on this subject is Mahon v. Stowers, supra. That case involved the priorities of claimants to funds held by a trustee in bankruptcy. After noting the "important" differences between packers and marketing agencies in the application of the Act, the court stated that " . . . the Act and regulations do not ex proprio vigore override the provisions of Texas law determining priorities to the funds in question . . . ."

Relying upon the reasoning in Capitol, Adams, Mahon, and the district court cases, Maly contends that its dishonoring of four drafts in three separate and distinct cases was not a "practice" prohibited by § 208 of the Act. Moreover, Maly observes that it had agreed to honor drafts drawn by Wenzl only as long as Wenzl had sufficient cattle in the pens to cover the drafts when they arrived; that there is no evidence in the Hays and Plainville cases that there were sufficient cattle in the pens to cover the drafts; and that the sales barns assumed the risk of loss if Wenzl failed to have sufficient cattle in the pens when the drafts were presented. Finally, Maly says that it is in no way responsible for Wenzl's conduct, and points out that, in each case, Wenzl purchased the livestock on his own account; that waybills for trucking and accounting sheets were issued to Wenzl as purchaser and owner; that Wenzl, as owner, shipped the livestock to Maly in Omaha; and that Wenzl received all profits and absorbed all losses upon resale of the cattle.

We think Maly's reliance upon the cited cases is unjustified when considered in light of the important differences between those cases and our own. Here, the crucial factual findings by the Secretary, when accorded prima facie weight under § 210(f) and buttressed by the judgment of the district court, are supported by substantial evidence and therefore have binding effect. Moreover, the Secretary's interpretation of the facts, to the effect that Maly engaged in an unjust and unreasonable practice violative of § 208, is as we have seen entitled to great deference. In Capitol, however, the facts did not support all of the findings, and some of the conclusions by the Secretary regarding unfair practices fell with the failure of the facts. Nor are Adams and Stowers directly apposite, since neither case involves the issue on which this case turns —i. e., an unjust and unreasonable practice by a marketing agency. Finally, the cited district court cases are distinguishable since we find much more involved in our case than a few "isolated acts." In any event, to the extent that the district court cases are not factually distinguishable, we respectfully decline to follow them.

We think our case is more identifiable with Branscome v. Schoneweis, 361 F.2d 717 (7th Cir. 1966). There, it was held that defendant Schoneweis was estopped to deny liability on dishonored checks written by his apparent partner, Woodrum, and that Schoneweis' failure to pay the checks was prohibited by the Packers and Stockyards Act. The case was precipitated by a complaint to the Secretary, who conducted a hearing and issued a reparations order. The findings and order of the Secretary were appeal-

ed under § 210(f) of the Act and, as here, upheld by the district court.

The orders and decisions in Schoneweis were based upon a finding of partnership by estoppel between Schoneweis and Woodrum. The Secretary in our case relied upon an estoppel theory in much the same way. And Maly argues that there can be no estoppel here for want of the requisite reliance on the representations incident to the drafting practice. The Secretary also held, however, that it was unjust and unreasonable for Maly to retain the proceeds from the resale of livestock with knowledge that the shippers of the livestock had not been paid. We are persuaded by this reasoning and hence do not reach the issue of estoppel.

Our primary concern is to effectuate the policy of a federal Act prohibiting "every unjust, unreasonable, or discriminatory regulation or practice." We think it would be wrong to predicate our interpretation and application of this crucial language of a national Act on the vagaries of state law. Technical legal labels and equitable principles, such as "agency by estoppel," may be helpful in our reasoning process, but the scope and breadth of the Packers and Stockyards Act should not be made to depend upon them. We prefer to rest our affirmance of the judgment on the Secretary's secondary finding and the broad policy of the Act.

■ We think it is fair to say that Maly used the drafting arrangement with Wenzl to facilitate the interstate movement of large amounts of livestock from the sales barns to its pens in Omaha, Nebraska, where Maly sold the livestock on commission. To paraphrase Chief Justice Taft in Stafford, Wenzl, as the buyer of the livestock at the sales barns in Kansas, was "at the elbow" of Maly in Nebraska.

Maly's vice-president stated that the drafting arrangement was the "common way" Wenzl was shipping livestock to his company. It must have been clear to him that when he sold the livestock shipped by Wenzl a draft for their pur-chase would probably follow in due course to Maly. Maly's dishonoring of drafts in this context, with knowledge that the sales barns had not been paid for the cattle they shipped, placed an inordinate burden on the barns, contrary to the purpose of the Packers and Stockyards Act "to secure the free and unburdened flow of livestock." The Secretary's ruling that such conduct was an unjust and unreasonable practice prohibited by § 208 is not without a rational basis in law and fact. Certainly we cannot say that the trial court's judgment approving and enforcing the orders is clearly wrong. This is not to say that the practice of drafting in the livestock industry or of not correlating drafts with the purchased livestock is, in itself, prohibited; it simply means that when a drafting arrangement such as that developed by Maly is used, and the market agency knows that the livestock which it has sold was purchased by customers' drafts drawn on it, the integrity of the marketing process requires that the drafts be honored.

### Liability on the Bond

■ Universal argues that its bond does not cover damages arising from an unjust or unreasonable practice prohibited by § 208. This contention is wholly without merit.

As we have seen, Universal's bond was executed pursuant to regulations issued by the Secretary (9 C.F.R. §§ 201.29–34) as authorized by § 204 of the Act, which stipulates that such bonds are to "secure the performance of [the] obligations" of those being bonded. Jurisdiction in the district court over such a bond is assured by the language of the bond itself ("any person damaged by the breach of any condition hereof may maintain an action on this bond . . . .") and by 28 U.S.C. § 1352. The bond states that Universal is liable if Maly sells on commission and fails to "pay when due to the person or persons entitled thereto the gross amount, less lawful charges, for which all livestock is sold for the accounts of others by said

principal." Universal's liability becomes manifest once we hold, as we do, that the sales barns are "entitled" to the proceeds from Maly's resale sufficient to pay the outstanding drafts.

### Award of Attorneys' Fees

■■ The district court awarded attorneys' fees for services rendered in the reparation proceedings and these enforcement proceedings. The court also awarded attorneys' fees in connection with Maly's effort in the Nebraska federal courts to enjoin the enforcement of the reparation orders. Maly contends that the awarding of attorneys' fees as costs in the reparation proceedings and in the Nebraska suit was unauthorized and that the cases should be remanded for proof of the reasonableness of the attorneys' fees in the enforcement proceedings. The sales barns respond that the issue is moot—as the fees have already been paid out of Wenzl's forfeited bond. We don't think so.

We hold that the question of attorneys' fees in this case is not moot since Maly will continue to "encounter adverse effects of the event in issue." Justin v. Jacobs, 145 U.S.App.D.C. 355, 449 F.2d 1017, 1019 (1971). See also Sigma Chi Fraternity v. Regents of University of Colorado, 258 F.Supp. 515, 523 (D.Colo. 1966). Cf. Powell v. McCormack, 395 U. S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Maly is adversely affected by the distribution of funds, at least to the extent that the attorneys' fees were illegally assessed and paid. This is so because the practical effect of the award will require Maly to pay more damages than otherwise would have been the case. Maly neither agreed to nor acquiesced in the distribution of the funds from Wenzl's bond and has superseded the total judgment. It has standing to raise the question on appeal.

■■ We need to remember that attorneys' fees "are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." Fleischmann Corp. v. Maier Brewing,

386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). If so authorized, the reasonableness of the attorneys' fees as determined by the trial court is not to be disturbed on appeal "unless under all of the facts and circumstances it is clearly wrong." United States v. Anglin & Stevenson, et al., 145 F.2d 622 (10th Cir. 1944).

■ We have, of course, no contract authorizing attorneys' fees in this case and must rely on § 210(f) of the Packers and Stockyards Act. That provision authorizes complainants to file suit in the district court to enforce reparation orders and "if the petitioner finally prevails, he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of the cost of the suit." This language is almost identical to that contained in § 8 of "the Act to Regulate Commerce," an Act which provided for issuance of reparation orders by the Interstate Commerce Commission and enforcement in the district courts. Interpreting the cited language authorizing attorneys' fees, the Supreme Court held that "in our opinion the services for which an attorney's fee is to be taxed and collected are those incident to the action in which the recovery is had and not those before the Commission . . . . It is only when the damages are covered by suit that a fee is to be allowed . . . ." Meeker & Co. v. Lehigh Valley R. R., 236 U.S. 412, 432, 35 S.Ct. 328, 336, 59 L.Ed. 644 (1914).

In line with Meeker, we hold that the plain language of § 210(f) precludes recovery of attorneys' fees incurred in reparation proceedings before the Secretary or in collateral suits to enjoin the Secretary's orders. Only fees authorized "as a part of the cost of the suit" to enforce reparation orders in the district court are allowable.

The several judgments are accordingly modified to deduct the erroneously awarded attorneys' fees. As modified, the judgments are affirmed.