**NATIONAL BANK OF GLENROCK, Appellant (Defendant),**

v.

**John O'NEAL, Appellee (Plaintiff),**

and

**Bob McMackin, Appellee (Defendant/Cross–Claimant).**

**No. 92–102.**

Supreme Court of Wyoming.

March 24, 1993.

Dennis M. "Joe" Hand of Hand & Hand, P.C., Casper, for Nat. Bank of Glenrock, appellant in No. 92–102; appellee in No. 92–103.

Harold E. Meier of Lonabaugh & Riggs, Sheridan, for John O'Neal, appellee in No. 92–102; appellant in No. 92–103.

Michael D. Zwickl, Beech Street Law Offices, Casper, for Bob McMackin, appellee in No. 92–102.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT* and GOLDEN, JJ.

GOLDEN, Justice.

In this appeal, we consider the National Bank of Glenrock's (Bank) contention that the district court erred in entering judgment against it, and in favor of John O'Neal, on his claim that the Bank was liable for permitting the Glenrock Livestock Exchange (GLE) to transfer funds from a "custodial," or trust-type checking account, to a general checking account. O'Neal contended that as a result of that transfer of funds he was not paid for cattle which GLE sold under the terms of the Packers and Stockyards Act.

We affirm.[1]

Appellant Bank provides this statement of the issues:

1. Can a depository bank be found liable to the payee of a timely dishonored insufficient fund check drawn on a nonfiduciary checking account under the circumstances of this case?

   a. Does a livestock seller have a valid claim or cause of action against a depository bank to recover sale proceeds under the circumstances of this case?

   b. Does a depository bank owe a legal duty to a livestock seller under the circumstances of this case?

2. Is a partner of the drawee of an insufficient fund check entitled to indemnity from the depository bank under the circumstances of this case?

Appellee O'Neal provides this statement of the issues:

1. Did the Court err in finding the depository bank liable to the Plaintiff O'Neal in transferring, or permitting and aiding in transferring funds, from a "custodial" or trust account, knowing that the transfers were not within the purposes of the custodial account, when the transfers caused a dissipation of O'Neal's funds?

2. Did the Court err in granting a Summary Judgment early in the case when the evidence of the transfer of funds from the custodial account and deposit of funds received from the O'Neal steers [cattle] into the custodial account was before the Court and the Court found at trial that the actions of the bank were committed knowingly and willfully?

Appellee Bob McMackin states these issues:

1. A depository bank is liable for its negligence in handling trust account monies.

2. A partner in a debtor/creditor relationship with a bank is entitled to indemnity for that bank's negligence in handling trust account deposits pursuant to an agreement between the depositor and the bank.

O'Neal was engaged in the business of buying and selling cattle. McMackin and his partners, Fred and Lynn Williams[2], did business as the Glenrock Livestock Exchange (GLE)[3]. GLE operated a livestock auction in Glenrock and also bought and sold cattle independent of the auction. GLE had several accounts at the Bank, and these included an "order buying account" and a "custodial account." The "order

---

* Retired January 1, 1993.

1. The appeal in case 92–103, which challenged the district court's judgment denying punitive damages against the Bank and in favor of O'Neal, was dismissed for want of prosecution. See Wyo.R.App.P. 5.06 and 5.11.

2. Fred and Lynn Williams did not answer the complaint and the district court entered a default judgment against them, and in favor of O'Neal, in the amount of $142,207.82, plus $42.25 as costs. United States Fidelity and Guarantee was also a defendant in the early stages of this case. O'Neal received $30,000 from it (representing the bond on the GLE's order buying account"), but a claim for an additional $25,000 (representing the bond on the "custodial account") was dismissed without prejudice. The claims on the bonds were made through the Packers and Stockyards Administration in Denver, Colorado.

3. GLE ceased doing business in late 1989 and presumably is defunct, though that does not appear of record. If personal or business entity bankruptcies resulted from the circumstances of this case, there is no evidence of that in the record, nor is any mention of it made by the parties, even in passing.

buying account" was used to pay for cattle purchased directly from a seller. The "custodial account" apparently was established to comply with the Packers and Stockyards Administration Act and Regulations, which required that GLE deposit the proceeds from the sale of livestock consigned for sale at auction in such an account. The evidence presented at trial demonstrated that GLE did not use the "custodial account" as it was required to do by federal law.

In December 1989, O'Neal consigned 127 steer calves and 88 heifer calves to GLE. On December 27, 1989, GLE paid for the cattle with checks drawn on its order buying account in the amounts of $56,739.30 and $32,468.40, respectively (total $89,-207.70). O'Neal negotiated the checks, but they were returned marked "insufficient funds." O'Neal contacted GLE and, from an examination of the Bank's records, determined that $48,257, which originally had been deposited into GLE's "custodial account," constituted a portion of the proceeds of the sale of O'Neal's livestock. The Bank had routinely permitted GLE to transfer funds to and from its various accounts to cover overdrafts, as well as fees for overdrafts. The usual procedure was for the Bank's cashier to telephone GLE and get authorization to move funds from one account to another to cover the overdrafts and fees. These transactions were memorialized on Bank fund transfer forms which were initialed by the Bank's cashier.

The Packers and Stockyards Act was passed in 1921 and was enacted in response to monopolistic practices within the packing and stockyard industries. S.Rep. No. 932, 94th Cong., 2d Sess. 1, 4 *reprinted in* 1976 U.S.C.C.A.N. (90 Stat.) 2267, 2270. As changes in livestock marketing patterns occurred, the Act was amended in reaction. The 1976 amendments are especially central in the resolution of the matter at hand. In January 1975, the American Beef Packers went bankrupt with very significant consequences for many livestock producers. General Electric Acceptance Corporation, the principal source of financing for American Beef Packers, stood ahead of the producers in the line of creditors waiting to be paid. 1976 U.S.C.C.A.N. at 2271; and *see, e.g., Mahon v. Stowers,* 416 U.S. 100, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974).

A portion of the legislative history of the 1976 amendments notes:

> No individual is engaged in a riskier endeavor or one more vital to the national interest than the [livestock] producer. And no entrepreneur is so completely at the mercy of the marketplace. The livestock producer, if he successfully combats the vicissitudes of weather, financing, and skyrocketing costs, must sell when his cattle are ready irrespective of the market. His livestock may represent his entire year's output. If he is not paid he faces ruin.

1976 U.S.C.C.A.N., *supra* at 2272.

In order to provide additional measures of protection for livestock producers, the Packers and Stockyards Act was amended in 1976 to include, *inter alia,* preemption of some state requirements for perfecting security interests, bonding of market agencies, prompt payment requirements, and a provision imposing a trust on funds held by market agencies which represented cash sales of livestock purchased from producers. That amendment is found in 7 U.S.C. § 196 (1980):

**Protection of public interest from inadequate financing arrangements**

(a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

**Livestock, inventories, receivables and proceeds held by packer in trust for benefit of unpaid cash sellers; time limitations; exempt packers; effect of**

**dishonored instruments; preservation of trust benefits by seller**

(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided,* That any packer whose average annual purchases do not exceed $500,000.00 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: *Provided,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary [of Agriculture].

The Secretary of Agriculture has authority to promulgate rules and regulations to carry out the purposes of the Packers and Stockyards Act. Pursuant to that authority the following regulation has been put in place:

### § 201.42 Custodial accounts for trust funds.

(a) *Payments for livestock are trust funds.* Each payment that a livestock buyer makes to a market agency selling on commission is a trust fund. Funds deposited in custodial accounts are also trust funds.

(b) *Custodial accounts for shipper's proceeds.* Every market agency engaged in selling livestock on a commission or agency basis shall establish and maintain a separate bank account designated as "Custodial Account for Shippers' Proceeds," or some similar identifying designation, to disclose that the depositor is acting as a fiduciary and that the funds in the account are trust funds.

(c) *Deposits in custodial accounts.* The market agency shall deposit in its custodial account before the close of the next business day (the next day on which banks are customarily open for business whether or not the market agency does business on that day) after livestock is sold (1) the proceeds from the sale of livestock that have been collected, and (2) an amount equal to the proceeds receivable from the sale of livestock that are due from (i) the market agency, (ii) any owner, officer, or employee of the market agency, and (iii) any buyer to whom the market agency has extended credit. The market agency shall thereafter deposit in the custodial account all proceeds collected until the account has been reimbursed in full, and shall, before the close of the seventh day following the sale of livestock, deposit an amount equal to all the remaining proceeds receivable whether or not the proceeds have been collected by the market agency.

(d) *Withdrawals from custodial accounts.* The custodial account for shippers' proceeds shall be drawn on only for payment of (1) the net proceeds to the consignor or shipper, or to any person that the market agency knows is entitled to payment, (2) to pay lawful charges against the consignment of livestock which the market agency shall, in its capacity as agent, be required to pay, and (3) to obtain any sums due the market agency as compensation for its services.

(e) *Accounts and records.* Each market agency shall keep such accounts and records as will disclose at all times the handling of funds in such custodial accounts for shippers' proceeds. Accounts and records must at all times disclose the name of the consignors and the amount due and payable to each from funds in the custodial account for shippers' proceeds.

(f) *Insured banks.* Such custodial accounts for shippers' proceeds must be

established and maintained in banks whose deposits are insured by the Federal Deposit Insurance Corporation.

Packers and Stockyards Administration, USDA, 9 C.F.R. § 201.42. (1992).

By letter dated April 14, 1989, the bank was provided this information by the Acting Regional (Denver) Administrator of the Packers and Stockyards Administration:

> Our records show that Bob McMackin and Fred Williams d/b/a Glenrock Livestock Exchange, Glenrock, Wyoming, has established its custodial bank account with your bank. Because some banks have failed to recognize and treat this account as a trust account, the Packers and Stockyards Administration is notifying banks handling custodial accounts for market agencies of the trust nature of such accounts to avoid future problems for the banks and to insure protection for livestock consignors at the markets.
>
> Bob McMackin and Fred Williams d/b/a Glenrock Livestock Exchange is a market agency selling livestock on a commission basis subject to the jurisdiction of the Packers and Stockyards Act which is administered by the Packers and Stockyards Administration, U.S. Department of Agriculture.
>
> Under the provisions of the Act and the regulations issued thereunder, market agencies are required to establish a custodial account for shippers' proceeds and the gross proceeds from the sale of consigned livestock must be deposited in that account. The account may be used only for the payment of proceeds to consignors and for the payment of lawful marketing charges, such as commission, yardage, trucking, feed and brand inspection. The Federal Deposit Insurance Corporation (FDIC) will insure each consignor having an interest in the account up to $100,000, if the account is maintained properly.
>
> Section 201.42 of the regulations issued by the Packers and Stockyards Administration, a copy of which is enclosed, specifies that the account must be designated as "Custodial Account for Shippers' Proceeds" and that funds deposited in the account are trust funds. Section 201.42 also specifies the procedure for the proper maintenance of the custodial account. Please review your records of this account to assure that the account is properly designated and handled as a trust account.
>
> If you have any questions, please feel free to contact this office.

The record also reveals that neither the Bank president nor its cashier knew anything about "custodial accounts" as contemplated by the 1976 amendments to the Packers and Stockyards Act. They did not necessarily deny ever having received the letter set out above, but clearly neither had read it or understood the nature of GLE's "custodial account." In addition, the record makes clear that GLE simply did not use its custodial account as it was required to be used. Neither Fred or Lynn Williams were available at trial, so we are unaware of what their thoughts were on the "custodial account." McMackin was a silent partner in GLE and did not know what was going on until after GLE had failed, and all the events at issue here were over. Two witnesses who were employed by banks, other than the Bank at issue here, and several employees of the Packers and Stockyards Administration, testified that the Bank seriously erred in its handling of the GLE "custodial account."

We agree with the district court's essential finding in this case:

> The series of events resulting in this loss were occasioned by the transfer of funds out of the Custodial Account to cover overdrafts in other accounts held by the Glenrock Livestock Exchange. The Court is satisfied that once the funds were deposited in the Custodial Account they became the property of Mr. O'Neal and withdrawals from the account were in contravention of the regulations of the Stockyard and Packers Act.

Although the Bank professed ignorance of the requirements of the Packers and Stockyards Act, as well as that the "custodial account" was intended to be a trust-type account, we are satisfied that the evi-

dence presented to the trial court supports its conclusion that the Bank knew, or should have known, that the funds deposited into the "custodial account" were not available to pay the overdrafts and Bank fees to which they were applied and that the Bank should not have permitted the sort of wholesale transfer of trust funds without inquiry. Indeed, in most instances the transfers were effected at the Bank's suggestion. We are comfortable that the district court's findings are consistent with the intent of the Packers and Stockyards Act in this situation. *See Cent. Bank of Mississippi v. Butler,* 517 So.2d 507 (Miss. 1987); *South Cent. Livestock Dealers v. Sec. State Bank of Hedley,* 551 F.2d 1346 (5th Cir.1977); *Steere v. Stockyards Nat'l Bank,* 113 Tex. 387, 256 S.W. 586 (1923); 5A MICHIE ON BANKS AND BANKING, § 137 (1983).

The judgment of the district court is affirmed.