STATE of North Dakota, Plaintiff
and Appellant,

v.

LIBERTY NATIONAL BANK AND
TRUST COMPANY, a North Dakota
Corporation, Defendant and Appellee.

Civ. No. 870256.

Supreme Court of North Dakota.

June 28, 1988.

**308**

Allen C. Hoberg (argued), Asst. Atty. Gen., Atty. General's Office, Bismarck, for plaintiff and appellant. Appearance by Nicholas J. Spaeth.

Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, for defendant and appellee, argued by Gordon W. Schnell. Appearance by Mary E. Maichel.

Keith C. Magnusson (argued), Bismarck, for amicus curiae N.D. Bankers Ass'n.

LEVINE, Justice.

The State appeals from a district court summary judgment dismissing its divestiture action against Liberty National Bank and Trust Company [Liberty National] on the ground that the three-year limitation for holding farmland under § 10–06–13(5), N.D.C.C., of the corporate farming laws is not applicable to Liberty National because the state provision is pre-empted by 12 U.S.C. § 29 of the National Bank Act. We reverse.

The facts are not disputed. Liberty National is a national bank chartered by and subject to the supervision of the Comptroller of the Currency pursuant to the National Bank Act of 1864, 12 U.S.C. § 21 *et seq.* Marvin D. Lutz defaulted on a $150,000 loan from Liberty National which was secured in part by a real estate mortgage covering 320 acres of farmland in Slope County. In order to avoid foreclosure of the mortgage, Lutz conveyed the 320 acres to the Bank by warranty deed dated September 19, 1983. The agreed value of the land, approximately $107,000, was credited upon the loan indebtedness. The Bank leased the land to Lutz with an option to purchase from 1983 to 1986, but in the fall of 1986 Lutz told the Bank he had quit farming and would not buy or lease the land. According to the Bank, it has attempted to locate purchasers by seeking private bids and listing the property with a realtor, but has not received any offers "for an amount which would prevent the Bank from suffering a substantial loss on its investment."

The State brought this action against Liberty National in February 1987 pursuant to § 10–06–13, N.D.C.C., to force the Bank to divest itself of the farmland because it had held the land for more than three years and none of the statutory exceptions for holding the land for a longer period applied. The Bank admitted that none of the statutory exceptions applied, but claimed in its answer that the three-year holding period in § 10–06–13, N.D.C.C., was pre-empted by the five-year holding period in 12 U.S.C. § 29. The district court agreed with Liberty National and granted summary judgment dismissing the action. The State appealed.

After oral argument in this court, we were informed by counsel that Liberty National has sold the land involved in this lawsuit. We will not dismiss an appeal as moot where the matter in controversy is one of great public interest and involves the authority and power of public officials, or where the matter is " 'capable of repetition, yet evading review.' " *Matter of Prettyman,* 410 N.W.2d 533, 536 (N.D. 1987) [quoting *Forum Publishing Co. v. City of Fargo,* 391 N.W.2d 169, 170 (N.D. 1986) quoting *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791,

2797, 49 L.Ed.2d 683 (1976)].[1] The issue presented in this case is a question of great public interest and will have important consequences in the State's future enforcement of the corporate farming laws. Moreover, considering a bank's continuing obligation to attempt to divest itself of foreclosed property and the length of time required for a case to work its way through the trial and appellate court processes, we believe that this issue is capable of repetition, yet evading review. We therefore conclude that the issue in this case is not moot and proceed to the merits.

## PRE–EMPTION PRINCIPLES

■ National banks were brought into existence under federal legislation, are instrumentalities of the federal government, and are necessarily subject to the paramount authority of the United States. *First National Bank v. Missouri*, 263 U.S. 640, 656, 44 S.Ct. 213, 215, 68 L.Ed. 486 (1924). As such, Congress has the authority to determine the extent to which state law is pre-empted with respect to a national bank's activities. *See Federal Land Bank of St. Paul v. Lillehaugen*, 404 N.W.2d 452, 455 (N.D.1987).

■ The standards for deciding a pre-emption question are well established. Essentially, federal pre-emption of state law can occur in one of three ways. First, Congress may explicitly define the extent to which it intends to pre-empt state law. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95–96, 103 S.Ct. 2890, 2898–2900, 77 L.Ed.2d 490 (1983). Express pre-emption of state law occurs when Congress specifically declares in a federal statute that it intends to pre-empt state law in a particular field. *See Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364

(1986); *Aloha Airlines, Inc. v. Director of Taxation*, 464 U.S. 7, 104 S.Ct. 291, 78 L.Ed.2d 10 (1983).

■ Second, even when there is no express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation and thereby impliedly preempt state law. *See City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Implied or occupation of the field pre-emption can be inferred "where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose.'" *Schneidewind v. ANR Pipeline Co.*, —— U.S. ——, ——, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988) [quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)]. *See also Pacific Gas & Electric Company v. St. Energy Resources Conserv.*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

■ Third, even when Congress has not intended to entirely displace state law in a particular area, state law is pre-empted to the extent that it "actually conflicts" with federal law. *Michigan Canners & Freezers v. Agricultural Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). Conflict pre-emption occurs where compliance with both federal and state laws is a physical impossibility, *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed. 2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objec-

---

**1.** Although *Matter of Prettyman*, 410 N.W.2d 533, 536 (N.D.1987), might indicate that the factors of "great public interest," "authority and power of public officials," and "capable of repetition, yet evading review" must each be established before we will deem an appeal not moot, these factors are components of two separate tests for determing whether we will treat a case as moot. Whether the matter in controversy is one of great public interest *and* involves the authority and power of public officials is the

test this court has historically employed in resolving mootness issues. *See North Dakota Wheat Growers' Ass'n v. Moore*, 52 N.D. 904, 204 N.W. 834 Syllabus 2 (1925); *State v. Stutsman*, 24 N.D. 68, 139 N.W. 83 Syllabus 1 (1912). We adopted as an alternate test the United States Supreme Court's doctrine of "capable of repetition, yet evading review" in *Forum Publishing Co. v. City of Fargo*, 391 N.W.2d 169, 170 (N.D. 1986).

tives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See also Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); *Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978).

▇ Courts are reluctant to infer pre-emption, *Federal Land Bank of St. Paul v. Lillehaugen, supra,* and it is the burden of the party claiming Congress intended to pre-empt state law to prove it. *Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 216 Cal.Rptr. 345, 362, 702 P.2d 503, 520 (1985), *appeal dismissed,* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). We also recognize that the pre-emption doctrine is "not inapplicable ... simply because real property law is a matter of special concern to the States: 'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.'" *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) [quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)]. In the final analysis, "the question whether federal law in fact preempts state action in any given case necessarily remains largely a matter of statutory construction." L. Tribe, *American Constitutional Law* § 6–25, at p. 480 (2d ed. 1988). *See also Schneidewind v. ANR Pipeline Co., supra* ["A pre-emption question requires an examination of congressional intent."]

Liberty National does not contend that Congress has expressly pre-empted state holding periods for real estate. Nor does it contend that Congress, through enactment of the National Bank Act, has impliedly pre-empted the entire field of regulation over national banks. *See First National Bank v. Missouri, supra* ["[N]ational banks are subject to the laws of a State in respect to their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their effi-

ciency as federal agencies or conflict with the paramount law of the United States."]; *McClellan v. Chipman,* 164 U.S. 347, 356–357, 17 S.Ct. 85, 87, 41 L.Ed. 461 (1896); *Biby v. Union National Bank of Minot,* 162 N.W.2d 370, 375 (N.D.1968). Rather, the Bank asserts that the state holding period for real estate is pre-empted by the federal law because an actual conflict exists. The Bank does not contend that the conflict exists because compliance with both the state and federal laws is a physical impossibility, but because the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

### 12 U.S.C. § 29

12 U.S.C. § 29 currently provides:

*"§ 29. Power to hold real property*

"A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others:

"First. Such as shall be necessary for its accommodation in the transaction of its business.

"Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

"Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

"Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it.

"But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years except as otherwise provided in this section.

"For real estate in the possession of a national banking association upon application by the association, the Comptroller of the Currency may approve the possession of any such real estate by such association for a period longer than five years, but not to exceed an additional five years, if (1) the association has made a good faith attempt to dispose of the

real estate within the five-year period, or (2) disposal within the five-year period would be detrimental to the association. Upon notification by the association to the Comptroller of the Currency that such conditions exist that require the expenditure of funds for the development and improvement of such real estate, and subject to such conditions and limitations as the Comptroller of the Currency shall prescribe, the association may expend such funds as are needed to enable such association to recover its total investment.

"Notwithstanding the five-year holding limitation of this section or any other provision of this chapter, any national banking association which on the date of enactment of this paragraph held, directly or indirectly, real estate, including any subsurface rights or interests therein, that since December 31, 1979, had not been valued on the books of such association for more than a nominal amount, may continue to hold such real estate, rights, or interests for such longer period of time as would be permitted a State chartered bank by the law of the State in which the association is located if the aggregate amount of earnings from such real estate, rights, or interests is separately disclosed in the annual financial statements of the association."

When originally enacted in 1864 as part of the National Bank Act, § 29 did not provide for any exceptions to the five-year holding limitation for possession of real estate purchased to secure debts. The Supreme Court has stated that the primary objective of the restrictions placed upon national banks "was obviously threefold. It was to keep the capital of the banks flowing in the daily channels of commerce; to deter them from embarking in hazardous real-estate speculations; and to prevent the accumulation of large masses of such property in their hands, to be held, as it were, in mortmain." *National Bank v. Matthews*, 98 U.S. (8 Otto) 621, 626, 25 L.Ed. 188 (1878); *see also First Nat'l Bank of Bellaire v. Comp. of Currency*, 697 F.2d 674, 681 (5th Cir.1983). It has also been said that the restrictions were "de-signed to protect bank depositors and stockholders from risky investments." *Central Nat'l Bank v. Fleetwood Realty Corp.*, 110 Ill.App.3d 169, 65 Ill.Dec. 730, 736–37, 441 N.E.2d 1244, 1250–1251 (1982); *see also Exchange Bank of Commerce v. Meadors*, 199 Okl. 10, 184 P.2d 458, 463 (1947). The legislative history reveals that although the primary purpose of the original five-year limitation was undoubtedly to prevent national banks from becoming extensive and monopolistic holders of real estate, Congress also considered the adverse consequences of forced divestitures on the banks.

As originally proposed, the National Bank Act contained no time limitation on the holding of real estate. The House of Representatives sought to remedy this lack of a limitation period by an amendment requiring real estate not necessary for the bank's business "to be offered for sale at public auction at the door of the banking house of such association within six months after acquiring the title to the same...." Cong. Globe, 38th Cong., 1st Sess. at 1352 (1864) (statement of Rep. Holman). This amendment was withdrawn by its sponsor after an opponent termed it "vicious and injudicious" and stated that "[i]f there be such a depression as there was in 1837 and 1857, and it should continue for two or three years, this provision would compel the banks to sell the land which they might hold instead of letting them hold it to a future time when it may be disposed of to advantage." Cong. Globe, *supra* (statement of Rep. Stevens).

The five-year limitation period was subsequently offered as an amendment in the Senate. *See* Cong. Globe, 38th Cong., 1st Sess. at 2019–2020 (1864). This amendment was also attacked because it would allegedly "operate very injuriously and be hard on the banks" and would "restrain them or compel them to sell unreasonably or may even impose on them an impossible condition." Cong. Globe, *supra*, at 2020 (statement of Sen. Sherman). The amendment was agreed to, however, after its sponsor stated:

"It seems to me that it would be impolitic and might turn out to be mischievous to allow a bank thus indefinitely to acquire and indefinitely to hold the title and possession of real estate. I think it is a monopoly in the acquisition of real estate that ought not to be allowed to a bank. The time of five years which I have fixed within which to compel it to part with the title and possession of real estate that it may purchase in satisfaction of its debts, may be too short, but I should think it would be ample. If that time is too short, let a further extension within a reasonable period be proposed. It seems to me that five years is ample time to enable a bank to make every prudent and proper arrangement in the disposition of any real estate it may purchase in satisfaction of its debts." Cong. Globe, *supra* (statement of Sen. Davis).

Thus, Congress' choice of the five-year limitation period reflects its reasoned judgment in tempering the adverse consequences arising from its primary goal of preventing banks from becoming monopolistic holders of real estate.

Although the benefit of providing an extension of the five-year limitation was first recognized in the debates concerning the 1864 legislation, it was not until 1980 that Congress amended § 29 to allow an extension under certain circumstances. The current provision, allowing the Comptroller of the Currency to extend the holding period to a maximum of ten years if a good faith attempt is made to dispose of the property within the five-year period or if it appears that disposal would be detrimental to the bank, was introduced at the request of the Comptroller as one of several "noncontroversial," "housekeeping" amendments to the national banking laws which became part of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. No. 96–221, § 701(a), 94 Stat. 132, 186 (1981). *See* S.Rep. No. 96–368, 96th Cong., 2d Sess. 13, *reprinted in* 2 1980 U.S.Code Cong. & Ad.News 236, 249; 125 Cong.Rec. 14,597 (1979). In seeking the amendment, the Comptroller expressed concern that the five-year limitation period "does not take into account depressed economic conditions which might prevent disposal of real estate at prices reflecting the bank's investment...." 125 Cong.Rec. 14,-599 (1979) (letter from John G. Heimann, Comptroller of the Currency, to William Proxmire, Chairman, Committee on Banking, Housing and Urban Affairs, U.S. Senate, dated May 31, 1979).

The most recent amendment to § 29 came two years later when Congress enacted the Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, § 413, 96 Stat. 1469, 1521–1522 (1984). This amendment permits certain national banks holding real estate which has been nominally valued in their books since December 31, 1979, to continue to hold this real estate for such further period of time as permitted by the law applicable to state chartered banks in the state in which the owning bank is located. *See* Sen.Rep. No. 97–536, 97th Cong. 2d Sess. 33, 62, *reprinted in* 3 1982 U.S.Code Cong. & Ad.News 3054, 3087, 3116. The legislative history on this particular provision, however, is sparse.

The primary purpose of § 29 remains unchanged. Section 29 is still directed to the goal of preventing national banks from accumulating large amounts of real estate. However, the 1980 and 1982 amendments reflect Congress' intent to provide banks some relief from the rigidity of the original absolute five-year limitation.

SECTION 10–06–13, N.D.C.C.

Section 10–06–01, N.D.C.C., provides that "[a]ll corporations, except as otherwise provided in this chapter, are prohibited from owning or leasing land used for farming or ranching and from engaging in the business of farming or ranching." Certain exemptions from this prohibition are set forth in § 10–06–13, N.D.C.C.

*"10–06–13. Enforcement.*

> \* \* \* \* \* \*

"4. Subject to the divestiture requirements of subsections 5, 6, and 7, a domestic or foreign corporation may acquire farmland or ranchland as security for indebtedness, by pro-

cess of law in the collection of debts, or by any procedure for the enforcement of a lien or claim thereon, whether created by mortgage or otherwise.

"5. Unless retention of the farmland or ranchland is permitted under subsection 6 or 7, all farmland or ranchland acquired as security for indebtedness, in the collection of debts, or by the enforcement of a lien or claim shall be disposed of within three years after acquiring ownership, if the acquisition would otherwise violate this chapter.

"6. The disposition requirement does not apply to a corporation that has acquired title to the land through the process of foreclosure of a mortgage, or a deed from a mortgagor instead of a foreclosure, if, by the expiration of one month after what is or what would have been if the mortgage had been foreclosed the redemption period of the mortgage, that corporation leases to the prior mortgagor from whom it was acquired, with an option to purchase, and if documents evidencing the lease agreement have been filed with the register of deeds of each county in which the land is located. A copy of a notice of lease is sufficient evidence. The exemption in this subsection applies for only five years and then only if the property has been appraised in accordance with subsection 8. The annual lease payments required of the tenant cannot exceed seven percent of the appraised value.

"7. The disposition requirement does not apply to a corporation that has acquired title to the land through the process of foreclosure of a mortgage, or a deed from the mortgagor instead of foreclosure, if, by the expiration of one month after what is or what would have been if the mortgage had been foreclosed the redemption period of the mortgage, that corporation contracts for the sale of the land to the prior mortgagor from whom it was acquired, and if documents evidencing the purchase agreement have been filed with the register of deeds of each county in which the land is located. A copy of a notice of the contract for deed is sufficient evidence. An exemption under this subsection is valid only if an appraisal has been made in accordance with subsection 8, and if it is valid, the exemption is unlimited in duration. The sale price cannot exceed the price determined by the appraisers."

In 1932 North Dakota voters approved an initiated measure which became known as North Dakota's anti-corporate farming law. *See* Note, *An Analysis of House Bill 782: The Latest Attempt to Repeal North Dakota's Ban on Corporate Farming*, 44 N.D.L.Rev. 255, 256 (1968). That initiated measure is currently found in amended form in Chapter 10–06, N.D.C.C. *See State v. J.P. Lamb Land Company*, 401 N.W.2d 713, 715 (N.D.1987). When the law was originally adopted, "North Dakota was at the bottom of the great depression" and the "Act was aimed in large measure at life insurance companies and out-[of]-state corporate lenders which had foreclosed on thousands of acres of North Dakota agricultural land." McElroy, *North Dakota's Anti–Corporate Farming Act*, 36 N.D.L. Rev. 96 (1960). *See also* Note, *supra*, 44 N.D.L.Rev. at 256–257.

Numerous efforts to alter the prohibition against corporate farming finally succeeded in 1981. *See* 1981 N.D.Sess.Laws Ch. 134; Note, *North Dakota's Corporate Farming Statute: An Analysis of the Recent Change in the Law*, 58 N.D.L.Rev. 283, 286–287 (1982). The three-year divestiture period for creditor corporations was part of this legislation. The statute required that "[a]ll farm or ranch land acquired as security for indebtedness ... be disposed of within three years after acquiring ownership ...," and, like the original 1864 federal legislation, did not provide any exceptions for extending the divestiture period. 1981 N.D.Sess.Laws Ch. 134,

§ 10. While the legislative history concerning this particular facet of the legislation is meager, we agree with the observation that the intent, as well as the "practical effect of the 1981 restrictions on creditor corporations is to protect their legitimate business interests while preventing the accumulation of farm and ranch land by such corporations." Note, *supra*, 58 N.D.L.Rev. at 292 (footnote omitted). Thus, the purposes and goals underlying the original 1981 state three-year divestiture period are identical to those underlying the original 1864 federal five-year divestiture period.

The extension periods for divestiture under state law were enacted by the Legislature in 1985. *See* 1985 N.D.Sess.Laws Ch. 146, § 1. A five-year extension beyond the initial three-year period is allowed to a creditor corporation if the corporation leases with an option to purchase to the mortgagor from whom the land was acquired. *See* § 10–06–13(6), N.D.C.C. The extension period is unlimited in duration if the creditor corporation contracts for the sale of the land to the prior mortgagor. *See* § 10–06–13(7), N.D.C.C. The legislative history reveals that the purpose of this legislation was to encourage lenders to work out problems and negotiate with mortgagors. *See* Minutes of the House Agriculture Committee, H.B. 1636, February 7, 1985; Minutes of the Senate Agriculture Committee, H.B. 1636, February 28, 1985, March 8, 1985, March 15, 1985, and March 26, 1985. It was further believed that by encouraging lenders to work out repayment arrangements with the borrower, land would be kept off the market, thereby halting the decline in farm real estate values, so that lenders, as well as borrowers, would benefit. Minutes of the Senate Agriculture Committee, H.B. 1636, February 28, 1985, and March 26, 1985 (statements of Rep. R. Meyer).

Thus, the primary purpose of the three-year divestiture period under state law, like the primary purpose of the five-year divestiture period under § 29, is to prevent the accumulation of farmland and ranchland by corporations. Furthermore, the State Legislature, like Congress, has attempted, through recent amendments, to alleviate the rigidity of the three-year period by providing for extensions under certain circumstances.

## ANALYSIS

Counsel have cited numerous cases in support of their respective positions. The cases cited are not particularly helpful, other than for statements of general pre-emption principles, because none addresses the specific issue we face here. Perhaps *Omaha Nat'l Bank v. Spire*, 223 Neb. 209, 234, 389 N.W.2d 269, 284 (1986), comes closest, but there the court declined to decide whether that state's five-year limitation on the holding of farm and ranch lands, without exception, was pre-empted by 12 U.S.C. § 29 because the question was "too theoretical to determine in a declaratory judgment action at this time." We have been unable to find any decision addressing the precise issue before us.

■■■ We are not convinced that there is an "actual conflict" for pre-emption purposes between 12 U.S.C. § 29 and § 10–06–13, N.D.C.C. A state law is not invalid under the Supremacy Clause merely because it differs from a federal law. *See generally CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, ——, 107 S.Ct. 1637, 1645–1648, 95 L.Ed.2d 67 (1987); *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Pinney Dock and Transport Co. v. Penn. Cent. Corp.*, 838 F.2d 1445, 1480–1482 (6th Cir.1988); *Rousseff v. Dean Witter & Co., Inc.*, 453 F.Supp. 774, 780–782 (N.D.Ind.1978); L. Tribe, *American Constitutional Law* § 6–26, at p. 491 (2d ed. 1988); *but compare Transamerica Ins. Co. v. Standard Oil Co.*, 325 N.W.2d 210, 213 (N.D.1982). Rather, the inquiry is whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. As we have noted, the primary purpose of each law is the same, *i.e.*, preventing banks and corporations from becoming monopolistic holders of real estate. So too, there is a

similar congruity of the secondary goals, *i.e.*, providing a measure of protection to banks and corporations through the respective legislative bodies' reasonable choices of appropriate divestiture periods. Thus, the state law is not repugnant to the purposes and objectives of the federal law. By incorporating the federal proscription against banks holding real estate "in mortmain," state law, in fact, enhances the primary purpose of the federal statute. *See Rousseff v. Dean Witter & Co., Inc., supra*, 453 F.Supp. at 781; *cf. CTS Corp. v. Dynamics Corp. of America, supra.* "[W]here ... the state law enhances the primary and overall purpose of the federal law, it is not invalid under the Supremacy Clause." *Rousseff v. Dean Witter & Co., Inc., supra*, 453 F.Supp. at 782.

Nor do we believe that § 10–06–13 operates to frustrate Congress' objectives in enacting the recent "housekeeping" amendments to § 29 allowing the Comptroller of the Currency to extend the holding period an additional five years if a good faith attempt has been made to dispose of the property or if it appears disposal would be detrimental to the bank. The State Legislature, like Congress, has eased the rigidity of the three-year limitation by allowing exemptions. While the exemptions under state law are more narrowly drawn than those allowed by § 29, the Legislature could reasonably determine that the exemptions will provide adequate protection for the banks, and we believe that the state statute as a whole does no violence to the purpose and objectives of the federal statute. We conclude that § 10–06–13, N.D. C.C., is not pre-empted by 12 U.S.C. § 29. Accordingly, the district court erred in determining that the state three-year divestiture requirement was not applicable to Liberty National.

Liberty National contends that if § 10–06–13 is not pre-empted by § 29, state-chartered banks would have a competitive advantage over national banks because state banks are allowed to hold real estate for at least five years under § 6–03–09, N.D.C.C. *See generally First National Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), and 7

*Michie on Banks and Banking*, Ch. 15, § 154 (1980), discussing the concept of "competitive equality" in banking activities. We disagree with Liberty National's assertion.

Section 6–03–09, N.D.C.C., provides:

*"6–03–09. Holding of real estate— Limitation.* No banking association may hold the possession of any real estate under mortgage, nor title and possession of any real estate purchased to satisfy indebtedness, for a longer period than five years from the date of acquiring title thereto unless such time has been extended by certificate of the commissioner."

National banks are specifically excluded from the definition of a "banking association" for purposes of Title 6. *See* § 6–01–02(1), N.D.C.C.

On their face, both the three-year divestiture period under § 10–06–13 and the five-year divestiture period under § 6–03–09 would appear to apply to a state bank's holding of farmland or ranchland. Because of this irreconcilable conflict between the two statutes, Liberty National contends that pursuant to § 1–02–07, N.D.C.C., the special provision, *i.e.*, § 6–03–09, prevails over the general provision, *i.e.*, § 10–06–13. However, we do not believe § 1–02–07, N.D.C.C., helps to resolve this statutory conflict.

The three-year divestiture period under the corporate farming laws is a general provision in the sense that it applies to all "corporations," but it is also a special provision insofar as it applies to divestiture of only "farmland or ranchland." § 10–06–13(5), N.D.C.C. Likewise, § 6–03–09 is a special provision in the sense that it applies to only state "banking associations," but it is also a general provision because it applies to divestiture of "any real estate." We have held that § 1–02–07, N.D.C.C., is inapplicable where the statutory provisions under consideration "are all special and consequently are of the same stature." *Northwestern Savings & Loan Ass'n v. Baumgartner*, 136 N.W.2d 640, 643 (N.D.1965). We believe § 1–02–07 is equally inapplicable where both provisions are general in nature, or where, as here,

the provisions under consideration have both conflicting general and special features thus rendering it impossible to determine which provision the Legislature intended to prevail. Under these circumstances, "the subsequent act must prevail." 2A Sands, *Sutherland Statutory Construction,* § 51.03, at p. 469 (4th ed. 1984). *Cf. Northwestern Savings & Loan Ass'n v. Baumgartner, supra;* § 1–02–08, N.D. C.C. Because § 10–06–13 is the more recent enactment, we conclude that state banks are subject to the three-year divestiture period with regard to farmland or ranchland. Thus, national banks are not placed at a competitive disadvantage by their being subject to the three-year divestiture requirement.

Accordingly, the district court summary judgment dismissing the State's complaint is reversed.

ERICKSTAD, C.J., LEVINE, GIERKE and MESCHKE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of VANDE WALLE, J., disqualified.