1998 ND 120

James BILLEY and Pete Peterson,
Plaintiffs and Appellees,

v.

NORTH DAKOTA STOCKMEN'S
ASSOCIATION, Defendant
and Appellant.

Civil No. 970332.

Supreme Court of North Dakota.

June 4, 1998.

Rehearing Denied July 1, 1998.

Lynn M. Boughey, of Boughey Law Firm, Minot, for plaintiffs and appellees.

Gordon W. Schnell, of Mackoff, Kellogg, Kirby & Kloster, P.C., Dickinson, and Robert F. Williams (on brief), Rutgers University School of Law, Camden, N.J., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] The North Dakota Stockmen's Association (Stockmen's Association) appeals from a summary judgment declaring portions of N.D.C.C. §§ 36–09–18, 36–22–03, and 36–22–08 unconstitutional. Concluding brand inspection and registration fees are public moneys which must be paid over to the state Treasurer under North Dakota's Constitution, we affirm.

I

[¶ 2] The Stockmen's Association was formed in 1929, and incorporated as a nonprofit corporation in 1941. Prior to 1949, brand inspection in North Dakota was conducted by county brand inspectors, veterinarians, and the Stockmen's Association. In 1949, the legislature designated the Stockmen's Association as the sole entity authorized to conduct brand inspections in the state. 1949 N.D. Sess. Laws Ch. 231, § 2; see N.D.C.C. § 36–22–02. The Stockmen's Association employs a Chief Brand Inspector, two fieldmen, and approximately thirty other employees statewide to conduct brand inspections. The fees for brand inspections are set by the Board of Animal Health, a state board whose members are appointed by the Governor. See N.D.C.C. §§ 36–01–01 and 36–22–03. All fees generated by brand

inspections are paid into the general fund of the Stockmen's Association. N.D.C.C. § 36–22–03.

[¶ 3] Under the version of N.D.C.C. Ch. 36–09 in effect prior to 1993, the state Agriculture Commissioner was responsible for recording brands or marks, maintaining brand books, collecting fees for recording brands, and paying those fees over to the state Treasurer. In 1993, the legislature transferred these duties to the Stockmen's Association and directed the fees generated by brand registration and sale of brand books be paid into the general fund of the Stockmen's Association. *See* 1993 N.D. Sess. Laws Ch. 357; N.D.C.C. Ch. 36–09.

[¶ 4] The Stockmen's Association also is given broad authority over estrays. The Stockmen's Association is authorized to take all sale proceeds from estrays,[1] and, if those funds are unclaimed for one year, place them in its general fund. *See* N.D.C.C. Ch. 36–22. The Stockmen's Association uses these estray funds to purchase vehicles for the Chief Brand Inspector and two fieldmen.

[¶ 5] James Billey and Pete Peterson are North Dakota residents who own livestock and have registered brands. They brought this declaratory judgment action challenging the constitutionality of the brand inspection, brand recording, and estray provisions in N.D.C.C. Chs. 36–09 and 36–22. On cross-motions for summary judgment, the district court concluded portions of N.D.C.C. §§ 36–09–18, 36–22–03, and 36–22–08 violate N.D. Const. Art. X, § 12, which requires all public moneys be paid to the state Treasurer, and N.D. Const. Art. X, § 18, which prohibits the state from making loans, giving credit, or making donations to or in aid of any individual, association, or corporation. The court directed its order be stayed "until such time as it can be appealed" to this Court, and further stayed "until such time as the legislature can amend the statutes to properly conform to the Constitution of the State of North Dakota."

[¶ 6] The district court had jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C.

§ 27–05–06. This Court has jurisdiction under N.D. Const. Art. VI, § 6, and N.D.C.C. §§ 28–27–01 and 28–27–02. The appeal was timely under N.D.R.App.P. 4(a).

## II

[¶ 7] The Stockmen's Association asserts Billey and Peterson lack standing to challenge the constitutionality of the statutes. Billey and Peterson both have paid fees to register brands. Peterson owned cattle, which required brand inspection when he sold them, and he had paid brand inspection fees to the Stockmen's Association. "Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court." Black's Law Dictionary 1405 (6th ed.1990). Billey and Peterson clearly have an interest and are affected by the challenged statutes. Furthermore, any state taxpayer has standing to challenge a statute on the basis state funds are being unlawfully dissipated. *See Danzl v. City of Bismarck*, 451 N.W.2d 127, 129 (N.D.1990).

[¶ 8] The Stockmen's Association asserts standing is lacking because Peterson has "an ax to grind" with the Association. Peterson was employed by the Stockmen's Association for 37 years, including 23 years as a fieldman. Peterson apparently retired after conflicts with the executive vice-president of the Stockmen's Association, and the Association asserts he has an improper motive in bringing this suit. The Association, however, cites no authority indicating a plaintiff's motives for initiating suit may jeopardize his standing to sue. Motive is irrelevant to the determination whether a party has standing.

[¶ 9] We conclude Billey and Peterson have standing to bring this action.

## III

[¶ 10] The Stockmen's Association asserts the trial court erred in holding portions

---

1. "Estray" is defined in N.D.C.C. § 36–22–01: "Any marked or branded cattle found at any livestock market, to which a shipper cannot produce title or satisfactory evidence of ownership, is considered as an estray."

of N.D.C.C. §§ 36–09–18 and 36–22–03 violate N.D. Const. Art X, § 12.

[¶ 11] The legislature has given the Stockmen's Association exclusive authority to conduct brand inspection and recording in the state. N.D.C.C. Ch. 36–09 and § 36–22–02. Any fees collected under N.D.C.C. Ch. 36–09 for recording of brands, sale of brand books, and other related services, go to the general fund of the Stockmen's Association:

> "Any fees collected under this chapter must be deposited in the general fund of the North Dakota stockmen's association. The fees deposited under this chapter and section 36–22–03 are appropriated as a continuing appropriation to the North Dakota stockmen's association."

N.D.C.C. § 36–09–18. N.D.C.C. § 36–22–03 directs any funds collected for brand inspection services performed in the state must be deposited in the general fund of the Stockmen's Association:

> "Brand inspectors under this chapter shall charge and collect fees for inspections on all shipments or consignments of cattle at livestock markets ... and shall charge and collect fees for inspection at auction markets, buying stations, and packing plants ... which funds, so collected, must be paid into the general fund of the North Dakota stockmen's association."

[¶ 12] N.D. Const. Art. X, § 12, requires all "public moneys" be paid over to the state Treasurer and disbursed only by appropriation by the legislature:

> "All public moneys, from whatever source derived, shall be paid over monthly by the public official, employee, agent, director, manager, board, bureau, or institution of the state receiving the same, to the state treasurer, and deposited by him to the credit of the state, and shall be paid out and disbursed only pursuant to appropriation first made by the legislature; ..."[2]

[¶ 13] The seminal question is whether the fees generated under N.D.C.C. Chs. 36–09 and 36–22 are "public moneys." The Stockmen's Association asserts the fees are merely payment for services rendered between private parties and were never in the hands of any state official, and thus are not public moneys. The district court determined the Stockmen's Association acted as an agent of the state when providing brand inspection and recording services, and the fees generated are therefore public moneys.

[¶ 14] The Stockmen's Association's assertion the fees are a "quid pro quo" for services rendered and were never the property of the state is too simplistic. Under N.D. Const. Art. X, § 12, all fees collected by an officer or agent of the state for a state-wide public purpose, by authority of law, must be paid to the state Treasurer and spent only by specific appropriation. *See Menz v. Coyle,* 117 N.W.2d 290, 302 (N.D.1962); *Langer v. State,* 69 N.D. 129, 138–39, 284 N.W. 238, 243 (1939). There is no dispute these fees are for a state-wide public purpose and are collected under authority of law. *See* N.D.C.C. § 36–22–02 (purpose of inspection requirements is for protection of the North Dakota livestock industry and to ensure uniformity of inspections). Thus, if the Stockmen's Association is acting as an agent for the state in providing these services, the fees are covered by N.D. Const. Art. X, § 12, and must be deposited with the state Treasurer.

[¶ 15] The Stockmen's Association argues it is not acting as an agent of the state:

> "The trial court somehow concluded that brand fees were public money because the Association is 'an agent of the state.' We submit that in order for the Association to be an agent, there must be an intent on the part of the principal to create an agency relationship, and there must be a specific scope or set of powers for the agent to perform (to the exclusion of others).... There is nothing in NDCC § 36–22–02 or § 36–22–03 or elsewhere which indicates an intention to create an agency relationship, particularly one relating to collection of fees *for the State.* Rather, as stated above, the Association's brand inspection activities are a fee for service arrangement, a quid pro quo. Clearly, the plain intent is for the Association to perform the service and retain the fee. There is noth-

---

**2.** The constitutional provision includes numerous exceptions to its rule. None of these exceptions applies to the fees collected by the Stockmen's Association.

ing to even imply that the Association's possession of the fees is on behalf of the State or acting as an agent for the State."

[¶ 16] The Stockmen's Association's argument is the polar opposite of the position it asserted in prior litigation involving the nature of its brand inspection services. In *United States v. Robinson*, 106 F.Supp. 212 (D.N.D.1952), the United States sued the Stockmen's Association and the members of the State Livestock Sanitary Board, asserting the fees charged for brand inspections violated Ceiling Price Regulation 34 under the Defense Production Act of 1950, which restricted increases in charges for services in the course of a trade or business. The Stockmen's Association in that case asserted:

"that brand inspection of livestock is a governmental function coming under the police power of the State of North Dakota and that the North Dakota Stockmen's Association, a non-profit corporation, has been designated by statute as an agency of the State of North Dakota for the performance of such governmental function...."

*Robinson* at 216.

[¶ 17] The court agreed, holding:

"The law of the State of North Dakota, then, provides that inspection for health and brands *shall* be made before livestock is offered for sale. In other words, it is mandatory. The purpose of such inspection for either health or brands seems perfectly clear. Insofar as the inspection for brands is concerned, it is to determine ownership, to prevent and detect crime and to prevent fraud and to regulate the sale and distribution of livestock. That has none of the characteristics of a trade or business. It is performed under the direction of the State of North Dakota by a non-profit corporation. It is for the protection and benefit of the public generally....

"It further seems clear to the Court that by virtue of Chapter 36-22 ... the State of North Dakota, through legislative act, designated the North Dakota Stockmen's Association, a corporation, as its agency for the making of brand inspections on cattle sold within the state.... [C]ertainly the North Dakota Stockmen's Association is an agent of the state in making brand inspections. In other words, the North Dakota Stockmen's Association is, insofar as brand inspection is concerned, designated as an agency of the state to carry out the physical performance of a governmental function."

*Robinson* at 217. The opinion in *Robinson* also directly refutes the Stockmen's Association's assertion in this case it is merely providing a service for a fee:

"In this instance, the State of North Dakota, through the North Dakota Stockmen's Association, is selling neither a commodity nor a service in trade or business. It is in competition with no one. It is exercising purely a governmental function in policing the sale of livestock in the state through having inspectors inspect livestock for brand markings. No one other than the State of North Dakota, through the North Dakota Stockmen's Association, has been authorized to do such inspecting and make charge therefor."

*Robinson* at 218.

[¶ 18] Further support for the conclusion the Stockmen's Association is acting as an agent for the state and performing purely governmental functions when providing brand inspection or recording services is found in N.D.C.C. § 36-09-24:

"*Police powers of chief brand inspector and two fieldmen.* The chief brand inspector and two fieldmen employed by the North Dakota stockmen's association have the power:

"1. Of a police officer for the purpose of enforcing brand laws and any other state laws or rules relating to livestock.

"2. To make arrests upon view and without warrant for any violation of this chapter or any other state laws or rules relating to livestock committed in the inspector's presence.

"3. To respond to requests from other law enforcement agencies or officers for aid and assistance...."

This broad grant of police powers to the Stockmen's Association's employees is a clear indication the Stockmen's Association is act-

ing as an agent of the state when performing services under N.D.C.C. Chs. 36–09 and 36–22. The Stockmen's Association cites no basis for granting such police powers to a private entity merely performing a private service for a fee.

[¶ 19] Finally, the legislature also recognized these fees were public moneys belonging to the state. N.D.C.C. § 36–09–18 provides fees collected for brand inspection or recording services and deposited in the Stockmen's Association's general fund "are appropriated as a continuing appropriation" to the Stockmen's Association. If, as the Association asserts, the legislature intended to create a private fee-for-service arrangement, there would be no reason to attempt to make a continuing appropriation. "An 'appropriation' is the 'setting apart from the public revenue of a definite sum of money for the specified object in such a manner that the officials of the government are authorized to use the amount so set apart, and no more, for that object.'" *State ex rel. Link v. Olson*, 286 N.W.2d 262, 268 (N.D.1979) (quoting *Campbell v. Towner County*, 71 N.D. 616, 3 N.W.2d 822, 825 (1941), and *State v. Holmes*, 19 N.D. 286, 123 N.W. 884, 886–87 (1909)). By nature, an "appropriation" is the expenditure of public funds.

[¶ 20] The Stockmen's Association does not rely upon the "continuing appropriation" in N.D.C.C. § 36–09–18 to uphold the validity of the transfer of fees to its general fund. Rather, the Association asserts this language is "not necessary" because the Association has earned the fees and already has possession of the funds, so "[t]here is therefore no need for an appropriation."

[¶ 21] The question in this case is not the validity of a continuation appropriation in general, but whether a continuing appropriation can bypass the state treasury. In *Gange v. Clerk of Burleigh County District Court*, 429 N.W.2d 429 (N.D.1988), this Court upheld a continuing appropriation of marriage dissolution fees to fund a "displaced homemaker program." In doing so, the Court stressed the statute specifically directed the clerks of court to pay the fees to the state Treasurer, and therefore did not violate N.D. Const. Art. X, § 12. *Gange* at 435.

Other similar continuing appropriations provisions in our statutes also require payment of such fees first to the state treasury, with a subsequent appropriation of the funds to special uses. *See, e.g.,* N.D.C.C. § 4–10.1–09 ("spud fund" of the North Dakota Potato Council); N.D.C.C. § 54–17.4–09.1 ("fossil excavation and restoration fund" of the North Dakota Geological Survey). Although a continuing appropriation is not per se impermissible, any such appropriation must comply with N.D. Const. Art. X, § 12. A purported "continuing appropriation" which wholly bypasses the state treasury does not comply with the constitutional mandate all public moneys be paid to the state Treasurer.

[¶ 22] We conclude the Stockmen's Association acts as an agent of the state when performing brand inspection and recording services, and the fees thereby generated are "public moneys" under N.D. Const. Art X, § 12. Accordingly, those portions of N.D.C.C. §§ 36–09–18 and 36–22–03 which direct payment of fees into the general fund of the Stockmen's Association are unconstitutional.

## IV

[¶ 23] N.D. Const. Art. X, § 18, provides, in part:

"neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor. . . ."

The district court concluded that provision was violated by the portion of N.D.C.C. § 36–09–18 which provides the brand inspection and recording fees deposited in the general fund of the Stockmen's Association "are appropriated as a continuing appropriation" to the Stockmen's Association. The Stockmen's Association challenges the district court's holding, asserting there has been no donation or aid because the funds are not state funds, and because the Stockmen's Association provides a service for those fees. Because we have already held N.D.C.C. §§ 36–09–18 and 36–22–03 violate N.D. Const. Art. X, § 12, we need not address

whether those provisions also violate N.D. Const. Art. X, § 18. *See, e.g., Peterson v. Peterson,* 1997 ND 14, ¶ 22, 559 N.W.2d 826 (a court generally will not decide constitutional questions which are not necessary to its decision); *State v. King,* 355 N.W.2d 807, 809 (N.D.1984) (a court will inquire into the constitutionality of a statute only to the extent required by the case before it).

[¶ 24] The district court also concluded the portion of N.D.C.C. § 36–22–08 which allows receipts from the sale of estrays to go into the general fund of the Stockmen's Association violated N.D. Const. Art. X, § 18. The Stockmen's Association has not challenged this holding on appeal.

### V

[¶ 25] The Stockmen's Association asserts federal law requires that it receive and retain the fees for brand inspection within North Dakota, and any contrary interpretation of our statutes is preempted by federal law.

[¶ 26] The Packers and Stockyards Act of 1921, 7 U.S.C. §§ 181–231, authorizes the Secretary of Agriculture to regulate transactions affecting interstate commerce at stockyards. Anyone who buys or sells livestock in interstate commerce on a commission basis or offers services, including brand inspection, at a federally-regulated stockyard must register with the Secretary of Agriculture as a "market agency." 7 U.S.C. §§ 201, 203. Under 7 U.S.C. § 217a(a), the Secretary has discretion to authorize fees for brand inspection at federally-regulated stockyards, and to designate a single market agency to provide inspections:

"The Secretary may, upon written application made to him, and if he deems it necessary, authorize the charging and collection, at any stockyard subject to the provisions of this chapter, by any department or agency of any State in which branding or marking or both branding and marking livestock as a means of establishing ownership prevails by custom or statute, or by a duly organized livestock association of any such State, of a reasonable and nondiscriminatory fee for the inspection of brands, marks, and other identifying characteristics of livestock originating in or shipped from such State, for the purpose of determining the ownership of such livestock. No charge shall be made under any such authorization until the authorized department, agency, or association has registered as a market agency. No more than one such authorization shall be issued with respect to such inspection of livestock originating in or shipped from any one State. If more than one such application is filed with respect to such inspection of livestock originating in or shipped from any one State, the Secretary shall issue such authorization to the applicant deemed by him best qualified to perform the proposed service. . . . The decision of the Secretary as to the applicant best qualified shall be final."

The market agency which disburses the funds from the sale of the livestock must collect the brand inspection fees and pay them to the market agency which performed the inspection. 7 U.S.C. § 217a(c).

[¶ 27] The Stockmen's Association is a registered market agency under the Act, and has been authorized by the Secretary to perform brand inspection services at federally-regulated stockyards in North Dakota. The Stockmen's Association asserts 7 U.S.C. § 217a(c) therefore requires it receive and retain the fees for such inspections, and any contrary interpretation of state law is preempted.

[¶ 28] Because of the "interstitial nature of Federal law," preemption of state law by federal statute or regulation is not favored, and consideration under the Supremacy Clause begins with the basic assumption Congress did not intend to displace state law. *Federal Land Bank of St. Paul v. Lillehaugen,* 404 N.W.2d 452, 455 (N.D.1987). Accordingly, courts are reluctant to infer preemption, and the party claiming preemption bears the burden of proving Congress intended to preempt state law. *State v. Liberty National Bank and Trust Co.,* 427 N.W.2d 307, 310 (N.D.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988). Ultimately, "'the question whether federal law in fact preempts state action in any given case necessarily remains largely a matter of statutory construction.'" *Liberty*

*National Bank,* 427 N.W.2d at 310 (quoting L. Tribe, American Constitutional Law § 6–25, at 480 (2d ed.1988)).

[¶ 29] In *NoDak Bancorporation v. Clarkson,* 471 N.W.2d 140, 142 (N.D.1991), we enumerated the three bases of federal preemption:

"Federal preemption of state law may occur if: (1) Congress explicitly preempts state law; (2) Congress impliedly preempts state law by indicating an intent to occupy an entire field of regulation; or (3) state law actually conflicts with federal law."

*See also Liberty National Bank,* 427 N.W.2d at 309–10; *Lillehaugen,* 404 N.W.2d at 455. The Stockmen's Association does not assert Congress has explicitly preempted state law.

■ [¶ 30] The Stockmen's Association asserts the Packers and Stockyards Act evidences Congressional intent to occupy the entire field with regard to the sale of livestock and related services. The Stockmen's Association concedes, however, the Act does not apply to all livestock transactions within North Dakota. By its terms, the Act applies only to transactions occurring at a "stockyard" as defined in the Act. *See* 7 U.S.C. § 202(a). Furthermore, the specific provision governing brand inspection grants discretion to, but does not require, the Secretary to authorize collection of fees for brand inspection by a designated entity: "The Secretary *may, upon written application* made to him, *and if he deems it necessary,* authorize the charging and collection ... of a reasonable and nondiscriminatory fee for the inspection of brands ..." 7 U.S.C. § 217a(a) (emphasis added). If Congress had intended the federal law wholly occupy the field and prevent all state regulation of brand inspection, it surely would have employed mandatory, rather than discretionary, language.

[¶ 31] Any doubt about the preemptive effect of the Act is clarified in other provisions of the Act and in the regulations promulgated by the Department of Agriculture under the Act. Congress has specifically provided *limited* preemption under the Act for state provisions governing bonding of packers and payment requirements for livestock purchases:

*"Federal preemption of State and local requirements*

"No requirement of any State or territory of the United States, or any subdivision thereof, or the District of Columbia, with respect to bonding of packers or prompt payment by packers for livestock purchases may be enforced upon any packer operating in compliance with the bonding provisions under section 204 of this title, and prompt payment provisions of section 228b of this title, respectively: *Provided,* That this section shall not preclude a State from enforcing a requirement, with respect to payment for livestock purchased by a packer at a stockyard subject to this chapter, which is not in conflict with this chapter or regulations thereunder: *Provided further,* That this section shall not preclude a State from enforcing State law or regulations with respect to any packer not subject to this chapter or section 204 of this title."

7 U.S.C. § 228c. This provision would be mere surplusage if Congress intended the Act to wholly occupy the field and preempt *all* state regulation of subjects covered by the Act. The inclusion of a specific, limited preemption provision is a clear expression of Congressional intent the Act was not meant to wholly preempt state law in this field.

■ [¶ 32] The regulations promulgated under the Act by the Department of Agriculture also support this conclusion:

"The regulations in this part shall not prevent the legitimate application or enforcement of ... any other valid law, rule or regulation, or requirement to which any packer, stockyard owner, market agency, or dealer shall be subject which is not inconsistent or in conflict with the act and the regulations in this part."

9 C.F.R. § 201.4(a) (1998). This is a clear indication the Act, and the regulations thereunder, are not intended to entirely occupy the field and wholly preempt state law. When Congressional intent to preempt state law is not clear from the face of the statute, deference should be given to the implementing agency's interpretation of the statute. *Teper v. Miller,* 82 F.3d 989, 998 (11th Cir.

1996); *Health Maintenance Organization of New Jersey, Inc. v. Whitman*, 72 F.3d 1123, 1127, 1128 (3d Cir.1995).

[¶ 33] In *Mahon v. Stowers*, 416 U.S. 100, 113, 94 S.Ct. 1626, 1632, 40 L.Ed.2d 79, 89 (1974), the Supreme Court held "nothing in the Packers and Stockyards Act or the regulations issued by the Secretary under the Act overrides the Texas Business and Commercial Code in determining the respective rights of the parties to the funds held by the trustee" of a bankrupt meat packer. On the precise issue presented in this case, the court in *Black Hills Packing Co. v. S.D. Stockgrowers Ass'n*, 397 F.Supp. 622, 630 (D.S.D. 1975), held the Packers and Stockyards Act was not intended to preempt state laws governing brand inspection. *See also Kelly v. Lang*, 62 N.W.2d 770, 771, 773 (N.D.1953) (the Packers and Stockyards Act was not intended to preempt state laws governing chattel mortgages on livestock); *Sig Ellingson & Co. v. DeVries*, 199 F.2d 677, 679 (8th Cir.1952), *cert. denied*, 344 U.S. 934, 73 S.Ct. 505, 97 L.Ed. 719 (1953); *Birmingham v. Rice Bros.*, 238 Iowa 410, 26 N.W.2d 39, 44, *cert. denied*, 332 U.S. 768, 68 S.Ct. 79, 92 L.Ed. 353 (1947); *but see Colorado v. United States*, 219 F.2d 474, 477–78 (10th Cir.1954).

[¶ 34] We conclude the Packers and Stockyards Act was not intended to occupy the field, and does not wholly preempt state regulation of brand inspections.

[¶ 35] The Stockmen's Association asserts, even if the Act does not occupy the field and wholly preempt state law governing brand inspection, an interpretation of state law requiring the Stockmen's Association to remit the fees to the state Treasurer would directly conflict with 7 U.S.C. § 217a(c). The Stockmen's Association therefore asserts the federal law must prevail.

[¶ 36] We set forth the standards for applying "actual conflict" preemption in *Liberty National Bank*, 427 N.W.2d at 309–10:

"[E]ven when Congress has not intended to entirely displace state law in a particular area, state law is pre-empted to the extent that it 'actually conflicts' with federal law. *Michigan Canners & Freezers v.*

*Agricultural Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). Conflict pre-emption occurs where compliance with both federal and state laws is a physical impossibility, *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)."

*See also NoDak*, 471 N.W.2d at 142; *Lillehaugen*, 404 N.W.2d at 455. In this case, we believe the state and federal statutory schemes can be interpreted so compliance with both is not a "physical impossibility," and the Congressional purposes and objectives may be accomplished.

[¶ 37] Among the main objectives of the Packers and Stockyards Act are preventing monopolistic practices by packers and stockyard owners and ensuring fair and reasonable charges for stockyard services:

"The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil, which it sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect to prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers, on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce."

Stafford v. Wallace, 258 U.S. 495, 514–15, 42 S.Ct. 397, 401, 66 L.Ed. 735, 741 (1922); see also Mahon, 416 U.S. at 106, 94 S.Ct. at 1629, 40 L.Ed.2d at 85; United States v. Morgan, 307 U.S. 183, 188–89, 59 S.Ct. 795, 798–99, 83 L.Ed. 1211, 1216 (1939) (the Act's "dominant purpose [is] to secure to patrons of the stockyards prescribed stockyard services at just and reasonable rates").

[¶ 38] The Stockmen's Association asserts 7 U.S.C. § 217a(c) directly conflicts with any state requirement fees from brand inspections at stockyards be paid over to the state Treasurer. 7 U.S.C. § 217a(c) provides:

> "Charges authorized to be made under this section shall be collected by the market agency or other person receiving and disbursing the funds received from the sale of livestock with respect to the inspection of which such charge is made, and paid by it to the department, agency, or association performing such service."

[¶ 39] Read in light of the purposes and objectives of the Act, this provision is clearly intended to prohibit the market agency disbursing the funds from retaining a portion of the brand inspection fees, thereby increasing the overall cost of these services, reducing the profit to the seller, and increasing the cost to the ultimate consumer. See Stafford, 258 U.S. at 515, 42 S.Ct. at 401, 66 L.Ed. at 741. It governs the relationship between the two market agencies, one brokering the sale and the other providing brand inspection services.

[¶ 40] The statute does not purport to govern the ultimate disposition of the fees received by the "department, agency, or association performing such service." We see no conflict between state and federal law in a procedure whereby the Stockmen's Association receives the fees for brand inspection from the market agency disbursing the sale proceeds, as required by federal law, but then remits those fees to the state Treasurer, as required by state law. So interpreted, compliance with both statutory schemes is not a "physical impossibility" and the state law is not an obstacle to the purposes and objectives of the federal law. See Liberty National Bank, 427 N.W.2d at 309–10.

[¶ 41] We conclude the state statutory scheme, as interpreted in this opinion, is not preempted by the federal law.

VI

[¶ 42] The judgment of the district court, including the stay through the next legislative session, is affirmed.

[¶ 43] VANDE WALLE, C.J., and NEUMANN, MARING and MESCHKE, JJ., concur.

